[Civ. No. 32268. First Dist., Div. One. Apr. 14, 1975.]

GEORGE R. FOX, Plaintiff and Respondent, v.
CITY AND COUNTY OF SAN FRANCISCO, Defendant and Appellant.

**COUNSEL**

Thomas M. O'Connor, City Attorney, and John J. Taheny, Jr., Deputy City Attorney for Defendant and Appellant.

Belli, Ashe, Ellison & Choulos, Belli, Ashe & Choulos, Melvin M. Belli, Robert B. Ingram, Freedman & Low and Marshall S. Freedman for Plaintiff and Respondent.

**OPINION**

**WEINBERGER, J.\***—In this action for damages for injuries sustained by respondent on August 4, 1966, resulting from a collision between a bicycle he was riding and a Municipal Railway bus operated by one Jesse Lane, the jury returned a verdict in his favor and against the City and County of San Francisco, in the sum of $225,000. This appeal is from the judgment entered upon the verdict.

At the time of the accident respondent, George R. Fox, was 33 years old and was employed by a blueprint reproduction firm as a bicycle messenger picking up and delivering blueprints throughout San Francisco. His employer furnished the bicycle he used in his work, and during the nearly five-year period he had been so employed, he estimated that

---

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

his wages averaged about $150 per week including overtime pay. His testimony disclosed that immediately before the accident he had no health problems of any kind, no visual impairment nor hearing loss. Except for the amputation of a finger in an industrial accident some years earlier, he admitted no physical impairment whatsoever.

Three doctors testified concerning respondent's mental and physical condition after the accident. They found Mr. Fox to be in the very low normal range of intellectual capacity, having an I.Q. somewhere between 52 and 70. It was the doctors' opinion that this impaired mental capacity had existed from birth or very early childhood. Despite his subnormal intelligence the evidence is uncontroverted that before the accident Mr. Fox had been able to hold his job, ride his bike in downtown San Francisco, live alone and apparently attend to his own affairs. Even after the accident, he was able to pass the test and qualify for a California motor vehicle driver's license.

The only testimony regarding the circumstances surrounding the accident was given by respondent, the bus driver, and a passenger on the bus. Mr. Fox testified that he was working as a bicycle messenger delivering blueprints at the time of the accident. He was proceeding westerly on Market Street in downtown San Francisco and as he approached Powell Street there were two or three cars ahead of him, the closest being 10 to 15 feet away, and that he did not have to slow down on their account. He testified that as he drove along Market Street he would travel "two to four feet from the curb" unless he had to pull out around a parked or a stopped car. He demonstrated to the court and jury what he meant when he said he traveled "two to four feet" from the curb by holding up his hands and the trial judge stated that the distance the plaintiff indicated was more like a couple of inches than two to four feet. Respondent testified that he let the cars approaching Powell Street ahead of him make their turn; that he did not go around them, but stayed behind, and they were moving the whole time he saw them. After the cars turned, he went on straight across the intersection, staying close to the edge of Market Street. He testified he did not remember the bus passing him just before the accident and did not know whether the bus and bicycle collided.

Mr. Lane, the bus driver, testified he did not recall how far the bus was from the curb when a passenger stated that he thought the bus had hit someone on a bicycle. He remembered seeing someone riding a bicycle as the bus was traveling several blocks east of Powell Street and he

sounded the horn to go around the bicycle rider. He testified that he did not remember seeing a bicycle rider again until after the accident when he saw the plaintiff lying in the street. Mr. Lane testified that before the accident he stopped the bus behind two or three cars stopped at the northeast corner preparing to turn right into Eddy or Powell Street; that he waited momentarily, then, as the cars moved forward, he swung somewhat to his left, swung back to his right, straightened out the bus and proceeded across the Powell Street intersection. He estimated his speed at about 10 miles per hour.

After being informed that the bus had hit someone, Mr. Lane stopped immediately, got off the bus and looked under it but saw no one. Then he looked to the rear of the bus and saw respondent lying on the pavement to the rear and to the right of a line representing an extension backward of the right side of the bus.

George Homenko testified that he was a passenger on the bus that was involved in the collision with Mr. Fox. He had been sitting on the long seat on the right side immediately behind the front door of the bus. He first noticed respondent on his bicycle at Montgomery Street, about four blocks east of Powell Street. He noticed Mr. Fox pass the bus as the bus stopped momentarily at the bus stop west of Stockton Street, one block east of Powell, and continue on in the curb lane.

The witness testified further that there were two or three cars stopped for a traffic signal in front of the Woolworth Store on the northeast corner of Market and Powell Streets. When the bus came up behind the automobiles, the respondent was stopped in the curb lane on the left-hand side of the automobiles next to the white line separating the curb lane from the lane nearer the westbound car tracks. When the signal changed, the bus driver pulled over to go around the automobiles that were making a right turn onto Eddy or Powell. The bus passed about 18 to 24 inches from the man on the bicycle. The bus driver sounded the horn, but Mr. Homenko did not know if the horn was sounded for the bicycle rider or the automobiles. The witness turned around to look forward and heard a "thump" on the back right side of the bus. He told the bus driver that he thought the driver had hit someone or something and the driver stopped immediately. When the bus stopped it was approximately 20 feet beyond the place where Mr. Fox was lying on the pavement.

Mr. Homenko testified that as respondent got to the place where the collision occurred there were no cars in front or in back of him and that

Mr. Fox was approximately 12 to 14 feet from the curb at that time. The witness stated that the bus was traveling in a "fairly straight" direction across the intersection until he called out to the driver that there had been an accident.

This appeal raises a question not heretofore decided by the courts of this state, namely, what amount of caution is a mentally retarded adult plaintiff required to exercise for his own safety? Stated in another way, under what circumstances and to what extent may an adult retardate be held responsible for his contributory negligence?

Appellant's primary contention is that the court erred in giving BAJI instruction No. 3.36, as follows: "The amount of caution required of a person whose faculties are impaired is the care which a person of ordinary prudence with similarly impaired faculties would use under circumstances similar to those shown by the evidence." Appellant is correct in noting that the citations listed in the comment under BAJI No. 3.36 refer to cases and the Restatement section dealing with *physical* disabilities. (*Conjorsky* v. *Murray* (1955) 135 Cal.App.2d 478 [287 P.2d 505]; *Jones* v. *Bayley* (1942) 49 Cal.App.2d 647 [122 P.2d 293]; Rest. 2d Torts, § 283 C.)

The Restatement Second of Torts makes no allowance for insanity or other mental deficiency when the actor, if he is an adult, is the *defendant.* (Rest. 2d Torts, § 283 B.) When the actor is the *plaintiff,* however, the Restatement specifically leaves open the question as to ". . . whether insane persons are or are not required to conform for their own protection to the standard of conduct which society demands of sane persons." (Rest. 2d Torts, § 464, Caveat.) The Restatement's position on mental deficiency which falls short of insanity, however, is that such impairment does *not* excuse conduct which is otherwise contributory negligence. (Rest. 2d. Torts, § 464, com. g.)

It is our conclusion that, as regards the facts of this case, the position of the Restatement is correct and the challenged instruction should not have been given. Counsel for appellant pointed out to the trial judge in chambers that the authorities cited in support of BAJI No. 3.36 dealt with physical disabilities, and that there were no California cases which authorized the use of the instruction in a case in which the "impaired faculties" consisted of mental deficiency falling short of insanity. The instruction was given over the appellant's objection.

Respondent relies upon *DeMartini* v. *Alexander Sanitarium, Inc.* (1961) 192 Cal.App.2d 442 [13 Cal.Rptr. 564, 91 A.L.R.2d 383], in which the plaintiff who had a history of mental disturbance voluntarily entered a private hospital specializing in the treatment of patients with mental and emotional problems. While a patient in the hospital, and one day after having received electric shock therapy, the plaintiff climbed a wall surrounding the hospital grounds and injured himself jumping down on the other side. He contended on appeal that he was incapable of contributory negligence as a matter of law and the jury should have been so instructed. The court held that it was proper to submit the matter to the jury and the following instruction was approved: " '. . . it is necessary for you to visualize a person in a similar condition when ascertaining what acts or omissions would be negligent and what would not be. Accordingly, if you find from the evidence in this case that at the time of the accident and immediately preceding it the Plaintiff . . . was in such mental condition that he was likely to harm himself or was not capable of realizing the consequences of his acts or of caring for his own safety, and that the defendant hospital, with knowledge of plaintiff's condition had undertaken to safeguard him and protect him against himself, then I instruct you that as a matter of law the Plaintiff . . . was not guilty of contributory negligence.' " (*DeMartini* v. *Alexander Sanitarium, Inc., supra,* at p. 448.)

It will be noted that the quoted instruction, to become applicable, required the jury to find that the plaintiff ". . . was in such mental condition that he was likely to harm himself or was not capable of realizing the consequences of his acts or of caring for his own safety . . . ." The instruction then goes on to require, before the jury could conclude that this plaintiff was not guilty of contributory negligence, ". . . that the defendant hospital, *with knowledge of plaintiff's condition* had undertaken to safeguard him and protect him against himself . . . ." [Italics added.] In the instant case there was no showing that Mr. Fox before the accident was in such mental condition that he was likely to harm himself or was not capable of realizing the consequences of his acts or of caring for his own safety. All of the evidence was to the contrary. In fact, in answer to the question as to where he would normally ride his bicycle on the street, Mr. Fox testified, "Like I'm supposed to be, next to the curb," thereby demonstrating his awareness of the rules of the road applicable to bicycle riders.

Also, in the instant case, the element of knowledge of plaintiff's condition, an important part of the instruction approved in *DeMartini,* is

completely lacking. The bus driver had no way of knowing of the respondent's subnormal mentality. A mental defective, unlike a child, or adults suffering from physical handicaps, does not by his very appearance suggest to all who observe him the need to exercise a greater degree of caution. (See 4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 522, pp. 2788, 2789.) Clearly, *DeMartini* does not support the giving of the impaired faculties instruction in the instant case.

*DeMartini* was cited with approval in the recent New York decision of *Mochen* v. *State of N. Y.* (1974) 43 App.Div.2d 484 [352 N.Y.S.2d 290] which discussed the subject extensively. That case dealt with a mentally ill patient who sustained severe injuries in attempting to escape from a state mental hospital. The court agreed with the Restatement position holding a mentally deficient defendant to the reasonable man standard and remarked that: "There are understandable policy reasons for such a rule (see Restatement, Torts 2d, § 283 B, p. 17). Policy reasons aside, however, the rule is supported by logic. Since negligent conduct is always determined objectively by the reasonable man test and without regard to the subjective fault of the actor, there is little reason to inquire into the mental capacity of the defendant. . . . Under any circumstances, the negligently injured plaintiff's right to be compensated does not depend upon the operation of the individual defendant's mind." (*Mochen* v. *State of N. Y., supra,* at p. 486.)

As regards a *plaintiff* suffering some type of mental infirmity less than total insanity the New York court stated at page 487: "We find no reason to adhere to the inelastic view that the disabled plaintiff is either 'totally' insane or legally accountable for his own contributory negligence. Considering the present state of medical knowledge, it is possible and practical to evaluate the degrees of mental acuity and correlate them with legal responsibility. Within the broad spectrum of scientifically differentiated mental illnesses, there are intermediate levels of disability which may *interfere with the perception of danger or the free exercise of judgment to avoid danger to such a degree that a mentally sick plaintiff suffering such an infirmity should be excused from responsibility for his own injury.* The disability may fall short of psychosis or severe retardation and the act may be a voluntary judgment by the patient but still be the product of impulse or irrational behavior beyond his control. *Under such circumstances,* a plaintiff should not be held to any greater degree of care for his own safety than that which he is capable of exercising (see *DeMartini* v. *Alexander Sanitarium, Inc.,* 192 Cal.App.2d 442; 1 N Y PJI 135; 2 Harper and James, Law of Torts, p. 927, § 16.8; 3

Warren's Negligence, § 2, p. 187; Ann. 91 ALR 2d 392; 65A C.J.S., Negligence, § 141; but, see, Restatement, Torts 2d, § 464)." [Italics added.]

In response to the contention made here that a subjective standard is applicable only in cases where the plaintiff suffers from physical rather than mental impairment the *Mochen* court stated at pages 487 and 488: "A plaintiff whose judgment has been blunted by mental disability should not have his conduct measured by external standards applicable to a reasonable normal adult anymore than a physically disabled plaintiff is held to the same standards of activity as a plaintiff without such a disability (see *Harris* v. *Uebelhoer,* 75 N. Y. 169 [blindness]; *Plunkett* v. *Brooklyn Heights R. R. Co.,* 129 App. Div. 572 [old age], affd. 198 N. Y. 568). It is appropriate that an injured party should be compensated for a defendant's error based upon objective standards of what an ordered society requires in the way of care towards others. *It is not appropriate that an injured party be foreclosed from recompense by objective notions of care not related in any way to his fault or to his ability to avoid fault.*" [Italics added.]

The New York court concluded that, as a matter of law, the plaintiff Mochen was not chargeable with contributory negligence. It was the court's purpose to " . . . decide what combination of perception and judgment a mentally disabled patient is required to exercise for his own care to avoid being charged with contributory negligence" (*Mochen* v. *State of N. Y., supra,* at p. 487) and its decision indicated its conclusion that plaintiff Mochen had neither sufficient perception nor judgment to provide for his own safety.

The rationale of *DeMartini* and *Mochen* is applicable to situations in which a plaintiff's act is intentional albeit irrational. In such cases it is entirely proper to determine whether a party suffers such diminished capacity to understand the possible consequences of his intentional act that he should not be charged with responsibility for such act. That is not the situation in the case at bench. The rationale applicable here was well expressed in *Neudeck* v. *Bransten* (1965) 233 Cal.App.2d 17 [43 Cal.Rptr. 250], involving a 16-year-old driver who requested the court to instruct the jury that a child, though violating a statute or ordinance, is not held to the same standard of conduct as an adult. The court said at page 21: "We hold that when a minor engages in an activity such as driving, which is normally undertaken by adults and for which adult qualifications are required, an exception to the general rule arises, and the minor should be held to the ordinary standard of care."

After pointing out that one cannot determine whether the operator of an approaching vehicle is a minor or an adult and usually cannot protect himself against youthful imprudence even if warned, the court concluded as follows: "A member of the traveling public has the right to expect that others using our highways, regardless of their age and experience, will obey the traffic laws and exercise the adult standard of ordinary care. To permit minors a more lenient standard is unrealistic, contrary to expressed legislative policy and inimical to the public safety." (*Neudeck v. Bransten, supra,* 233 Cal.App.2d 17, 23.)

In *Prichard* v. *Veterans Cab Co.* (1965) 63 Cal.2d 727, 732 [47 Cal.Rptr. 904, 408 P.2d 360], the court held that "The age of a minor who operates a motor vehicle [motorcycle] will not excuse him from liability for driving it in a negligent manner, and he will be required to meet the standard established primarily for adults."

While these cases state the rule applicable to minors, we see no reason why their logic is not applicable to mentally deficient adult plaintiffs. As was heretofore stated, this is the position of the American Law Institute (Rest. 2d Torts, § 464, com. g) and we conclude that, under the circumstances, it was error to give the instruction on "impaired faculties" in the instant case.

Furthermore, in the case at bench the instruction in question was irrelevant because there is no evidence in the record to support the conclusion that impaired faculties, mental or physical, played any part in *causing* the collision between the bicycle and the bus. Unless we assume that one's rating on the intelligence chart necessarily plays a part in every accident in which he becomes involved there is no justification in the instant case for giving the impaired faculties instruction. It is a truism that high intellectual attainment is no guarantee against occasional inattentiveness, forgetfulness or carelessness; and conversely, the absence of normal intellect does not compel the conclusion that every negligent act of a mentally retarded plaintiff is necessarily attributable to his substandard mentality. In the absence of evidence that a party's conduct was somehow attributable to or connected with his impaired faculties, the instruction is likely to be confusing and therefore should not be given. ■ An instruction is erroneous if, though abstractly correct as a statement of law, it is not within the issues developed by the evidence or reasonable inferences therefrom. And if it is likely to mislead the jury the error is prejudicial. (*DeGeorge* v. *Crimmins* (1967) 254 Cal.App.2d 544, 547 [62 Cal.Rptr. 394]; *Coleman* v. *Southern Pacific*

Co. (1956) 141 Cal.App.2d 121, 131 [296 P.2d 386]; *Gackstetter* v. *Market Street Ry. Co.* (1933) 130 Cal.App. 316, 325 [20 P.2d 93]; *Gregg* v. *McDonald* (1925) 73 Cal.App. 748, 758 [239 P. 373]; 4 Witkin, Cal. Procedure (2d ed. 1971) Trial, § 240, p. 3054.)

■ Counsel for respondent, at oral argument, conceded that there was no evidence introduced at the trial which tended to connect respondent's mental impairment with the happening of the subject accident. Nevertheless, respondent contends that since the court, over the objection of respondent's counsel, instructed on contributory negligence, it was proper to modify or limit the contributory negligence instruction by giving the impaired faculties instruction. We disagree. The doctrine of last clear chance, where applicable, is a recognized exception to the defense of contributory negligence (see 4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 714, p. 3002 et seq.), but it is reversible error to instruct on the doctrine where there is not sufficient substantial evidence of the necessary elements to justify the giving of the instruction. (*Miller* v. *Atchison, T. & S. F. Ry. Co.* (1958) 166 Cal.App.2d 160, 169 [332 P.2d 746]; *Dalley* v. *Williams* (1946) 73 Cal.App.2d 427, 432 [166 P.2d 595]; see also *Galbraith* v. *Thompson* (1952) 108 Cal.App.2d 617 [239 P.2d 468].) The same reasoning compels the conclusion that it is reversible error to instruct on impaired faculties absent substantial evidence tending to connect such impairment with the happening of an accident. A jury must not be permitted to assume that an injury to a person with a low I.Q. is necessarily attributable to his mental deficiency. Neither may jurors be invited to speculate, absent supporting evidence, that such person's impaired faculties are a factor in his contributory negligence, if any.

■ In holding that the "impaired faculties" instruction was irrelevant under the facts of the instant case, we do not mean to suggest that the medical testimony concerning the respondent's mental state both before and after the accident was not relevant. The major thrust of the respondent's claim for damages was that notwithstanding his intellectual deficiency, Mr. Fox before the accident was a functioning, self-sustaining, employable individual. He was qualified, despite his handicap, to do the work he was doing when he was injured, and there is no evidence in the case to support a contrary conclusion.

After the accident Mr. Fox's substandard mentality played an important part in aggravating the damage he suffered. The medical evidence established that many of the psychosomatic symptoms which

now make Mr. Fox unemployable cannot be treated by psychotherapy or psychoanalysis, both of which, to be effective, require that the patient possess greater mental acuity than respondent possesses. Thus respondent's impaired mental faculties, while playing no part in *causing* the accident, were a major factor in its *effect.* The court properly gave BAJI instruction No. 14.65, regarding aggravation of a preexisting condition or disability and a person's right to recover damages therefor even if the disability made him more susceptible to the possibility of ill effects than a normally healthy person would have been.

In considering whether the giving of the irrelevant instruction in the case at bench was prejudicial, we note that defense counsel during his argument defined negligence as he anticipated the court would define it and stated that that definition applied to the bicycle rider as well as the bus driver. The court interrupted to remark that ". . . there may be a different standard of conduct for the bike rider as compared to the bus driver" and admonished defense counsel not to preempt the court's function. Counsel then continued with the statement: "I believe His Honor will instruct you that it is the duty of every person using a public street or highway to exercise ordinary care at all times—." The court again interrupted stating: "I am not going to instruct and take it out of context. I am going to instruct that there are limitations with respect to Mr. Fox here. . . ."

Counsel reminded the court that it had been agreed in a discussion in chambers that counsel could refer to the instructions to be given provided the instruction was quoted accurately, to which the court replied: "I informed you that you could read the instructions. Now, don't argue. I also told you that the instructions must be taken in context, and I told you that you are not going to read every instruction. In order to understand the particular instruction, there is another instruction—if you want to read Section 3.36 at this time, okay, because that is what I am going to instruct on as applicable to the one you are going to read, as far as Mr. Fox is concerned, and I have told you that. It is not correct that the general concept of negligence applies to Mr. Fox. It is not correct, and that is not what I intend to instruct, and it is not correct that you are going to tell the jury now that it applies to Mr. Fox. It is not correct." Later in his argument defense counsel read BAJI instruction No. 3.36 as suggested by the court.

The jury was instructed that a bicycle rider is subject to all the duties applicable to the driver of a motor vehicle (Veh. Code, § 21202). These

instructions were followed by BAJI instruction No. 3.45 regarding the effect of a violation of statute proximately causing injury to another or oneself. The court omitted the reference to injury to oneself thereby excluding the plaintiff from the operation of the doctrine of negligence per se. Additionally the court instructed the jury *sua sponte* that ". . . any such violation on the part of a person whose faculties were impaired would not be negligence, if such person proves by a preponderance of the evidence that that person exercised the degree of care ordinarily exercised by persons of similar impaired faculties, and what that person would use under similar circumstances, and what his conduct would be."

It is quite apparent from a review of the record that the court instructed the jury that the standard of care applicable to the bus driver was different from the standard of care applicable to the plaintiff. Appellant is correct in stating that the standard of care is always the same—ordinary care under the circumstances. (*Lasater* v. *Oakland Scavenger Co.* (1945) 71 Cal.App.2d 217, 221 [162 P.2d 486]; 4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 504, p. 2770.) "In theory the standard remains the same, but it is sufficiently flexible to take . . . [one's] physical defects into account." (Prosser, Law of Torts (4th ed. 1971) § 32, p. 152.)

During its deliberations the jury sent a note to the court requesting that the instructions on contributory negligence and impaired faculties be reread. After the requested instructions were reread, juror number 4 inquired specifically about the "impaired faculties" instruction and was given the following answer: "Now, on the 'impaired faculties,' I think from time to time during the course of the trial, I indicated that your job would be the factual job of finding out what these impaired faculties were. I could give you a dictionary definition of 'faculties.' In reading it, Webster says it's synonymous with 'talent.' [¶] . . . I don't have any real definition of 'faculties' that I can offer you. It was argued by both counsel, and 'faculties' is faculties."

There are several other examples of confusion in the instructions attributable to the attempt to fuse the concept of diminished capacity with the rules applicable to a tort not involving intentional misconduct. The examples set forth above demonstrate that the challenged instruction was considered by the jury, that they were confused by it, and that it was the principal reason why defense counsel was not permitted to argue his case without court interruption. The prejudicial effect of the giving of the irrelevant instruction cannot be seriously questioned.

There are several other assignments of error which are not likely to occur on a retrial of the case so no useful purpose will be served by discussing them in detail. For example, the bus driver was asked if the city attorney had not told him that on his deposition he was "hooked" on · liability, that he was wrong. The witness answered that, "Some of that was mentioned to me, sir." Later testimony clearly established that the witness had been told nothing of this nature by the city attorney, but the witness' wife had told him that some unidentified man purporting to be a representative of the city attorney's office had telephoned and told her something to that effect. When it was established that the purported statement was hearsay as to the driver, a motion was made to strike the testimony which motion the court denied. At the retrial the bus driver should not be questioned about the statement, nor should anyone else be unless it is first established who made the purported statement and that such person was authorized to make it. (Evid. Code, § 1222.)

Jesse Lane, the bus driver, made statements to investigators for Municipal Railway of which they made written reports within days after the accident. His testimony given five and one-half years later was somewhat inconsistent with his earlier statements. Defense counsel attempted to lay the foundation to read these statements into the record as an inconsistent statement under Evidence Code sections 770 and 1235, or as past recollection recorded admissible subject to the conditions set forth in Evidence Code section 1237. The court refused to allow counsel to question the witness about his earlier statements until plaintiff's counsel was given an opportunity to read the investigators' reports. (See *Kadelbach* v. *Amaral* (1973) 31 Cal.App.3d 814, 821 [107 Cal.Rptr. 720].) The reports were marked for identification and plaintiff's counsel has now had an opportunity to read them. On the retrial of the case there should be no problem regarding the use of the written reports in compliance with applicable Evidence Code provisions.

The judgment is reversed.

Molinari, P. J., and Elkington, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied June 11, 1975.