## Tschan v. Snyder

*Martin M. Krimsky*, for plaintiff.
*James J. McEldrew*, for defendants.

McDEVITT, *J.*, October 3, 1977—This case was tried before the Honorable John J. McDevitt, 3rd, and a jury from October 25 to November 3, 1976. At the conclusion of trial the jury returned a verdict in favor of both defendants and against plaintiff. Plaintiff thereafter filed a motion for a new trial.

### I. FACTS

This is a medical malpractice action brought by plaintiff in her capacity as executrix of her husband's estate, pursuant to the Wrongful Death and Survival Statutes. Decedent was himself a medical doctor, board certified in dermatology, who was having dental work done by defendant, Dr. David Snyder, an endodontist, and Dr. Arthur Hattler, a periodontist.

In April, 1967, Dr. Tschan was referred by his family dentist, Dr. Porges, to defendants for a regime of dental treatment necessitated by a severe condition of decay in Dr. Tschan's teeth. Dr. Snyder was to perform root canal treatments to Dr. Tschan's teeth where the decay had progressed into the nerve areas. Then, Dr. Hattler was to perform periodontial surgery to those areas of gum and bone involved to expose the decayed portions of the gums, thereby enabling Dr. Porges to restore Dr. Tschan's teeth.

In April or May, 1967, Dr. Snyder performed root canal work on Dr. Tschan's teeth, involving the lower left first and second pre-molars and the lower right first or second pre-molar. On June 1, 1967, Dr. Hattler began the periodonture surgery on Dr. Tschan's mouth, which consisted of reflecting the gum from the teeth and removing a portion of bone, so the gum can be placed in a position where the entire decay of the tooth is exposed. This surgical procedure was performed upon Dr. Tschan's lower right second molar, the lower right second pre-molar, the lower right first pre-molar, and the lower right canine. A local anesthetic was given to Dr. Tschan for the purpose. Dr. Hattler explained that after healing of this incision, a similar procedure would be performed on the left side of the patient's mouth.

Mrs. Tschan testified that after the procedure on June 1, her husband complained of pain and stopped eating because his mouth was swollen. She said he also became very tense and anxious. On June 4, she found her husband in a stuporous condition and immediately called Dr. Marshall Shields, her husband's psychiatrist. Mrs. Tschan and Dr. Shields then transported Dr. Tschan to Lankenau

Hospital where he was treated for over medication of barbituates and later released the same day.

Subsequent to the June 4 incident, Dr. Tschan returned to his practice of medicine, and saw Dr. Hattler on June 8, 15 and 23 for normal post-operative care, including the change and removal of packing. Dr. Hattler testified that Dr. Tschan complained of swelling after the procedure on June 1, but had no such symptoms when he returned on June 8 or thereafter. Dr. Hattler stated that some-time during the latter part of June he received a call from Mrs. Tschan during which she expressed concern about proceeding with the surgical proce-dure on the left side, scheduled for June 30. For the first time, she informed him of the drug overdose on June 4, and asked him to consult Dr. Shields about the possibility of delaying the procedure or having it done in a hospital.

Dr. Hattler testified, without equivocation, that he called Dr. Shields and that the latter "expressed the opinion that we could proceed with office treatment." He also stated that had Dr. Shields ad-vised against the procedure, "in no way would I have done it." As for Dr. Tschan himself, Dr. Hat-tler testified as follows:

"Q. Did he at any time ever ask you or advise you that he did not want any of the two processes that you committed on him, done, that he never wanted them done or he didn't feel like he wanted them completed?

"A. Quite the contrary. I had a discussion with him after Mrs. Tschan's phone call, and he ex-pressed a strong desire to continue with treat-ment."

• • •

"Q. Now, when you saw Doctor Tschan at that time (on June 30) can you recall whether you were able to make a physical evaluation of the man at that time and if you could would you explain it to the ladies and gentlemen of the jury?

"A. I remember that he was in excellent spirits and he seemed perfectly all right to me at that time.

"Q. Did he offer any negative attitude towards having the procedure done?

"A. Quite the contrary. He was very anxious to have the procedure done."

Mrs. Tschan herself confirmed that her husband insisted on proceeding with the surgery on June 30. With respect to a conversation held the previous day, she testified:

"MRS. TSCHAN: I told my husband that Dr. Shields and I were both concerned about him and that we wanted him to postpone the appointment for the next day.

"And my husband was a very determined man, and he said, 'I want to get this over with; I can't stand the pain; no way am I going to postpone it.'"

The surgery on Dr. Tschan was completed at 4:45 p.m. after which he left Dr. Hattler's office and drove home. Mrs. Tschan was away at the time and did not return until late that evening when she found her husband dead in his bedroom. Dr. Frederick Reiders, a toxicological chemist who testified for plaintiff, found that Dr. Tschan had ingested three to five seconal tablets and three meparadine or demerol tablets, within eight to ten hours prior to death. Dr. Robert Catherman of the medical examiner's office reported that death was caused by hypoxia, the lack of oxygen to the body, brought

about by several factors, including the depressant effects from the seconal and demerol; the slumped position of the body, which was half in and half out of the bed, whereby mucous from the recent surgery obstructed air passages; the presence of severe coronary arteriosclerosis, with arteries narrowed to approximately one-third their normal caliber; and the shock to the body from the surgery.

Plaintiff's theory of recovery rested on the contention that Dr. Hattler was negligent in proceeding with the office surgery of June 30. In support thereof, plaintiff testified, in contradiction to Dr. Hattler, that her husband's physical and emotional condition had deteriorated since the first procedure. She said she took her husband to see Dr. Shields on June 29 and the latter agreed with her that the surgery scheduled for the next day should either be postponed or performed in a hospital. Mrs. Tschan stated she communicated this information to Dr. Hattler, who assured her he would not proceed. Dr. Shields supported this version and denied that Dr. Hattler had ever spoken to him.

The jury chose to resolve these conflicts by returning a verdict for Dr. Snyder and Dr. Hattler, and against Mrs. Tschan.

## II.  DISCUSSION

In petitioning for a new trial, plaintiff's counsel relies exclusively on the court's denial of eight points for charge, which provided as follows:

"24.  There are intermediate levels of disability which may interfere with the perception of danger to such a degree that a mentally sick plaintiff suffering from such an infirmity should be excused

from responsibility for his own injury. The disability may fall short of psychosis or severe retardation and the act may be a voluntary judgment by the patient but still be the product of impulse or irrational behavior beyond his control. Under such circumstances, a plaintiff should not be held to any greater degree of care for his own safety than that which he is capable of exercising: Mochen v. State, 352 N.Y.S. 2d 290, 43 A.D. 2d 484 (1974).

"25. It is necessary for you to visualize a person in similar condition when ascertaining what acts or omissions would be negligent and what would not be. Accordingly, if you find from the evidence in this case that at the time of the incident, and immediately preceding it, plaintiff's decedent was in such a mental condition that he was not capable of realizing the consequences of his acts or of caring for his own safety, and that either defendant, with knowledge of plaintiff's decedent's condition had undertaken to treat, care for, safeguard and protect him, then I instruct you that, as a matter of law, plaintiff's decedent was not guilty of contributory negligence: De Martini v. Alexander Sanitarium, Inc., 13 Cal. Reptr. 564 (1961).

"26. 'A plaintiff whose judgment has been blunted by mental disability should not have his conduct measured by external standards applicable to a reasonable normal adult anymore than a physically disabled plaintiff is held to the same standards of activity as a plaintiff without such a disability.' Mochen v. State, supra, at 294. See also, Davis v. Feinstein, 370 Pa. 449, 88 A. 2d 695 (1952).

"27. The care which a mentally ill patient must exercise to protect himself is not based upon the objective standards of the reasonable man, but

rather it is based upon the capacity of the claimant and his perception of danger, considering the degree of his illness. The conduct of plaintiff's decedent is to be judged by that conduct of others suffering similar disabilities: Horton v. Niagra Falls Memorial Center, 380 N.Y.S. 2d 116, 51 A.D. 2d 152 (1976).

"28. Defendant has claimed that plaintiff's decedent was guilty of contributory negligence at the time and place of the event in question. You are instructed that contributory negligence is negligence on the part of a person claiming injury or damage which is a proximate cause of the injury or damage complained of. Contributory negligence bars recovery on the part of a person suffering injury or damage, even though the opposing party is negligent.

"You are further instructed that if you find that plaintiff's decedent was in fact at the time of the event in question capable of exercising the care of a reasonable prudent man under the circumstances, then you may consider this question of contributory negligence.

"On the other hand, if you find that at said time plaintiff's decedent was not in fact capable of exercising the care of a reasonably prudent individual, then such claim does not constitute a defense: Hunt v. King County, 4 Wash. App. 14, 481 P. 2d 593 (1971).

"29. The evidence presented has indicated that plaintiff's decedent's act was intentional, albeit irrational. In such case, it is for you, the jury, to determine whether a party suffering under such a diminished capacity understood the possible consequences of his intentional act. If you find that plaintiff's decedent was unable to understand the

possible consequences of his act then plaintiff's decedent cannot be found to be contributorily negligent: Fox v. City and County of San Francisco, 47 Cal. App. 3d 164, 120 Cal. Rept. n., 779 (1975)."

The essence of all these points was that decedent's alleged contributory negligence was to be judged by a subjective standard which would consider his mental state and his ability to understand the consequences of his acts. This, of course, conflicts with the reasonable man approach which the court utilized in its charge:

"If you find that a defendant or defendants were negligent and that negligence was a proximate cause or a substantial factor of the loss or damage, then you must determine whether the plaintiff decedent—and that is Dr. Tschan—was contributorily negligent.

"Contributory negligence is the failure on the part of Dr. Tschan, the deceased plaintiff, to use the care, caution and diligence which a reasonably prudent person would have exercised for his own safety in the circumstances, which, to any degree however slight, contributes to the accident or death in a proximate way." (Charge N.T. 30-31) (See also Charge N.T. 25)

In asking us to deviate from the traditional reasonable man standard in cases of "mental disability," plaintiff's counsel cites no Pennsylvania authority except Davis v. Feinstein, 370 Pa. 442 (1952), which is inapposite since it dealt solely with standards relating to blind persons. Plaintiff's citations from other jurisdictions are also clearly distinguishable in that they all involved institutionalized persons. This is true of Mochen v. State, 352 N.Y.S. 2d 290 (1974) (plaintiff, a patient in a

state mental hospital); De Martini v. Alexander Sanitarium, Inc., 13 Cal. Rptr. 564 (1961) (plaintiff diagnosed as schizophrenic); Horton v. Niagara Falls Memorial Center, 380 N.Y.S. 2d 116 (hospitalized plaintiff was "disoriented and confused"); Hunt v. King County, 4 Wash. App. 14, 481 P. 2d 593 (1971) (plaintiff an institutionalized mental patient). All of these cases, of course, are a far cry from the instant situation.

The only decision cited by plaintiff which sheds light on our case is Fox v. San Francisco, 47 Cal. App. 3d 164, 120 Cal. Rptr. 779 (1975), wherein plaintiff was a mentally retarded adult. The trial court there had charged as follows, along the line proposed by present plaintiff: "'The amount of caution required of a person whose faculties are impaired is the care which a person of ordinary prudence with similarly impaired faculties would use under circumstances similar to those shown by the evidence.'"

In considering this subjective standard, the appellate court in Fox reviewed the applicable law:

"The Restatement Second of Torts makes no allowance for insanity or other mental deficiency when the actor, if he is an adult, is the *defendant*. When the actor is the *plaintiff,* however, the Restatement specifically leaves open the question as to '. . . whether insane persons are or are not required to conform for their own protection to the standard of conduct which society demands of insane persons.' (Rest. 2d Torts, §464 Caveat.) The Restatement's position on mental deficiency which falls short of insanity, however, is that such impairment does *not* excuse conduct which is otherwise contributory negligence. (Rest. 2d Torts, §464)." (Emphasis in original.)

The court then held that the subjective test used by the trial judge could only apply where plaintiff "'was in such mental condition that he was likely to harm himself or was not capable of realizing the consequences of his act or of caring for his own safety.'" 47 Cal. App. 3d 164, 170. Although plaintiff therein was mentally retarded the court found no evidence to support the requisite finding of insanity. It therefore ruled the trial judge had erred in charging the jury as quoted.

The instant situation is even more clear-cut for there was absolutely no evidence here that Dr. Tschan had lost contact with reality. Dr. Shields, his psychiatrist, said Dr. Tschan suffered from "overt, active anxiety" and manifested a "neurotic response" to stress. However, he indicated Tschan was always capable of dealing with his environment:

"A. Well, when you use the term psychotic, you mean that the patient or the person is no longer able to deal with reality; he is misidentifying stimuli in his environment; he may be delusional; he may be hallucinate; he may hear and see and feel things that are not present.

"Q. Was any of this evident in Donald Tschan?

"A. No. And his behavior—a psychotic's behavior would be obviously bizarre in the eyes of those that observed him.

"Now, he never had any manifestations of psychosis."

On this subject, Shields also responded as follows:

"Q. During your treatment of Doctor Tschan did you find him lacking in any mental capacity, to grasp a situation of danger to himself?

"A. No, Sir.

"Q. Would you say that he was able to recognize a situation that would present a problem to his health or to his life?

"A. Yes, I believe so."

Dr. Shields testified that after the June 4 drug overdose, there was a need to "safeguard" against another such incident. However, he said he did not consider readmitting Tschan to a hospital after that occurrence. Shields testified decedent began seeing him in late 1966 because of anxiety over his family life and financial resources: (Mrs. Tschan's testimony, N.T. 40-41). Tschan indicated some strain with his wife, and on three occasions Dr. Shields saw Mrs. Tschan alone.

It should be noted that in addition to treating patients of his own, Dr. Tschan served as administrator of a medical group, a position involving heavy responsibilities. Yet throughout his period of treatment by Dr. Shields, decedent continued his practice of dermatology; indeed, on one day he reported seeing over 120 patients. This energetic practice of medicine continued throughout the month of June, 1967, when he was undergoing dental treatment, up to and including June 30, the day he died.

Dr. Shields described Dr. Tschan as a man of "strong, driving ambition," in short, not unlike the typical professional in an urban practice. The anxiety symptons ascribed to him are all too common among people of this background, living in a pressurized environment. Certainly he was not so different from the norm as to warrant a deviation from the usual standard of judging conduct.

We believe the approach used by the California Court in Fox, supra, was completely proper. In the

absence of some showing that the party met the traditional criteria for insanity, i.e., loss of contact with reality, the reasonable man standard should apply. The latter is a time-honored concept which represents the very keystone of our jurisprudence. To discard that standard for some subjective test would render the entire system of negligence law unworkable. It would be all too easy for litigants to evade culpability by producing some evidence of neurosis. Consequently, the new standard proposed in plaintiff's points on contributory negligence was correctly denied.

## III. CONCLUSION

For the foreging reasons, plaintiff's motion for a new trial is denied.

## ORDER

And now, October 3, 1977, upon consideration of plaintiff's motion for a new trial, it is hereby ordered that said motion be denied.