FRANK TREPANIER v. DR. M. J. McKENNA AND OTHERS.
ITASCA MEMORIAL HOSPITAL, APPELLANT.

125 N. W. (2d) 603.

December 27, 1963—No. 38,712.

*Mahoney & Mahoney,* for appellant.
*Ryan & Ryan,* for respondent.

ROGOSHESKE, JUSTICE.

Appeal from a judgment entered pursuant to a verdict awarding plaintiff $3,100 damages for personal injuries sustained in a fall while he was a patient in defendant hospital.

Plaintiff sued his attending doctors as well as the hospital, alleging negligence. The court directed a verdict in favor of the doctors[1] and submitted the issues of negligence, proximate cause, contributory negligence, and damages against only the hospital.

The sole question presented for review is whether the evidence was sufficient to warrant submission of the issue of negligence to the jury.

The facts established by the testimony are undisputed except for conflicting versions of plaintiff's description of the accident. On September 14, 1960, plaintiff entered defendant hospital, a county-owned hospital located in Grand Rapids, Minnesota. He was then 86 years old and had been under treatment since August 6, 1956, by Dr. C. J. Johnson and Dr. M. J. McKenna of the Grand Rapids Clinic. He consulted them for ulceration of his toes and was receiving treatment for recurring ulceration and for a progressive decreased and diminishing circulation in his feet. He was also diabetic. His condition

---

[1] At the close of plaintiff's testimony and with the approval of plaintiff, a verdict was directed in favor of defendants Dr. M. J. McKenna and Dr. C. J. Johnson, plaintiff's attending doctors, and Grand Rapids Clinic of which they were members. Defendant thereupon rested its case, offering no evidence except as submitted upon redirect examination of Dr. C. J. Johnson and Mrs. Verna Maki (employed by defendant hospital as a nurses' aid), both of whom were called for cross-examination by plaintiff. Defendant hospital's motions for dismissal, for a directed verdict made immediately preceding the charge to the jury, and for judgment n. o. v. were all denied by the trial court.

upon admission to the hospital was described by Dr. Johnson as follows:

"Well, in essence this was an aged man, and my primary concern at the time he was admitted to the hospital was his right foot. He had developed at this time gangrene of his right third toe, which had become infected. He had some edema or swelling in both lower extremities, particularly the legs, ankles and feet, and he had pain particularly in his entire right foot. He had very shiny, red, thin skin over both legs and feet, which is characteristic of advancing arteriosclerosis or obliteration of the blood supply.

\*    \*    \*    \*    \*

"At the time of admission [gangrene] involved primarily the entire right foot, with a U-shaped area extending up on the sole of the foot in what we would call the ball of the foot at the base of the toes."

The doctor also testified that plaintiff suffered variable degrees of pain from the gangrenous condition; that he could not "by and large" stand on his right foot without severe pain; and that he could not walk without assistance. Neither doctor gave any special orders to the hospital concerning attending to plaintiff's toilet needs because they regarded this part of the care as routine hospital activity involving no need for particular medical advice.

Plaintiff was hospitalized to improve his general physical status in the hope of controlling the infection and his diabetes and to permit the gangrenous toe to "drop off" which, short of amputation, was the only possibility of relieving his pain. After the first 10 days of hospitalization, his diabetic condition was controlled and the infection improved, but his diminished blood supply caused the gangrene to advance so that it involved one-third of his right foot.

Both Dr. Johnson's testimony and the nurses' notes on the hospital charts establish that plaintiff was seldom free of pain in his foot and very often, from plaintiff's complaints and by observation, it was recorded that his pain was "sharp" and "severe" and that his "foot became extremely painful when up." He was given demerol, a pain-relieving drug, from the time of his admission. Two days before his fall,

the nurses' notes stated, "Gets up by self when he doesn't know what to do to relieve pain." The hospital record also reveals that shortly after his admission he attempted to climb out of bed; that bedrails were put on his bed; that he constantly complained of his discomfort; and that he was irritable, often noisy, apprehensive, and confused.

About September 23 or 24, with plaintiff's knowledge and consent, a decision was reached to amputate his right foot on September 27 in order to relieve his pain and stop the gangrene from advancing.

About noon on September 26 (his 12th hospital day), a nurses' aid and a practical nurse, two employees who performed their work under the direction of the nurses, placed plaintiff on a portable commode. There were no straps or other device to hold plaintiff upon the seat. The nurses' aid was called by plaintiff for cross-examination and testified that after they assisted him to the commode they told him to let them know "when he was done." There was a combination hall light and buzzer located within plaintiff's reach, but he did not remember seeing it. The call light could not be seen except in the corridor, although the nurses' aid testified that the buzzer could be heard in the room adjoining plaintiff's room where the employees had gone to give another patient a backrub. They were gone for less than 5 minutes and were called back after plaintiff had fallen. When they returned, another nurses' aid was helping him back to the bed. Dr. Johnson visited plaintiff shortly thereafter and testified that plaintiff gave him this version of the fall:

"I asked Mr. Trepanier what had happened. 'I fell down.' 'Well, how?' 'I was on the commode. I didn't think I could wait for the girls to come back and help me back to bed so I tried to get back to bed by myself and I fell.' "

Plaintiff testified that when he was in the hospital he was "a little off [his] head"; that he experienced sharp pains in his foot every once in a while; that he told the employees he was "dizzy" when they placed him on the commode; and also that they left him and were gone "quite a little bit long." During his testimony he gave this version of his fall:

"Well, I was right there and all at once the thing went right through my foot and my foot was all rotted, and I jumped right up in the air and that is all I can remember.

\* \* \* \* \*

"There was an awful pain, by gosh, went through my foot and I jumped right up in the air and I don't know where I landed."

As a result of the fall, plaintiff sustained a fracture of his left hip requiring surgical reduction and the insertion of a steel plate.

It is well established in this state that a hospital, private or charitable, in the performance of routine care of a patient owes a duty to use reasonable care for the protection and well-being of the patient commensurate with its actual or constructive knowledge of the patient's physical and mental condition.[2] Normally, a more definite standard of care than this cannot be formulated to cover every prospective combination of circumstances.

It is fundamental that, where there is dispute over the facts or inferences to be drawn from the testimony concerning the conduct of the hospital employees or the patient, it is for the jury to resolve the factual dispute. Moreover, where reasonable men may differ as to the particular standard of conduct required under a given set of circumstances, it is the jury's function to determine the details of what constitutes reasonable care and whether there has been a breach of the duty thereby imposed.[3] A court should declare the absence of negligence only where the facts are undisputed or where, notwithstanding some dispute, the evidence is so overwhelming on the issue that upon the facts established reasonable men could not differ in concluding that

---

[2]Mulliner v. Evangelischer Diakonniessenverein, 144 Minn. 392, 175 N. W. 699; Quick v. Benedictine Sisters Hospital Assn. 257 Minn. 470, 102 N. W. (2d) 36; Sylvester v. Northwestern Hospital, 236 Minn. 384, 53 N. W. (2d) 17; Swigerd v. City of Ortonville, 246 Minn. 339, 75 N. W. (2d) 217, 72 A. L. R. (2d) 398. See, also, Borwege v. City of Owatonna, 190 Minn. 394, 251 N. W. 915.

[3]Quick v. Benedictine Sisters Hospital Assn. *supra*; Prosser, Torts (2 ed.) § 39.

there was no departure from the conduct required by the duty to use reasonable care.[4]

The peculiar aspect of this case is that the only disputed facts concern plaintiff's conflicting versions of the manner in which he fell. Since the jury was permitted by the court's instructions to find the hospital negligent under either version, the question presented becomes whether both versions warranted submission of the issue to the jury. Defendant contends that, if plaintiff's fall resulted from acts provoked by a sudden, severe pain in his foot, the facts essential to establish negligence do not exist because plaintiff's action was involuntary and unanticipated. The record clearly refutes this argument as it is replete with evidence that would justify a finding that defendant knew, or ought to have known, from its own records that plaintiff had experienced sudden and severe pain which could foreseeably provoke involuntary actions.

A closer question is presented by defendant's contention that, if plaintiff's fall occurred while he attempted to return to bed without assistance, such conduct was not foreseeable but demonstrated his contributory negligence. Defendant relies primarily upon Johnson v. Mudbaden Sulphur Springs Co. 182 Minn. 476, 234 N. W. 680, and Clements v. Swedish Hospital, 252 Minn. 1, 89 N. W. (2d) 162. An examination of these and other authorities relied upon by defendant shows that they do not control this case since the facts of each are essentially different from the instant case. The record shows that plaintiff was dizzy when placed on the commode; that he was confused and noisy the morning of the day he fell; that he had tried to climb out of bed without assistance on one occasion; and that he was partially irrational on certain days. From these facts it appears that the hospital was not without warning that plaintiff might attempt to get up unassisted and, in view of his condition, fall and injure himself.

We are, therefore, of the opinion that whether plaintiff's fall was the result of either his involuntary reaction to severe pain, or his ef-

---

[4]See, Johnson v. Mudbaden Sulphur Springs Co. 182 Minn. 476, 234 N. W. 680; Mesedahl v. St. Luke's Hospital Assn. 194 Minn. 198, 259 N. W. 819; Clements v. Swedish Hospital, 252 Minn. 1, 89 N. W. (2d) 162.

forts to return to bed unaided, the issue of negligence was properly submitted to the jury. A jury issue existed because of the factual dispute over how the fall occurred and because reasonable men might well differ in regard to the precautions necessary to protect plaintiff from falling under the peculiar combination of circumstances shown.

Affirmed.