Milton Albert, J.
The claimant was born on December 24, 1945. At the time of the trial, claimant had reached her majority. Upon motion made at the opening of the trial, the title of the claim was amended to reflect that fact, and her parents, George and Anna Wendover, were deleted as party claimants.
Claimant, a product of a broken home, was raised by foster parents. Beginning quite early in life, the claimant was subject to epileptical-type seizures. Otherwise, with the further exception of a marked tendency toward obesity, claimant’s physical health was considered generally good.
In May of 1963, at the age of 17, the claimant was admitted to the Hudson River State Hospital as the result of an attempt to slash her wrists. Although the treatment at the hospital was concerned principally with her psychiatric examinations, the convulsive disorder was noted and controlled through medication. She was placed on convalescent care in October of 1963, released to her parents’ custody, and followed through the hospital’s clinic.
On January 21, 1964, the claimant was readmitted to the Hudson River State Hospital at about 8:00 a.m. by her father who advised the hospital that claimant had suffered several seizures the night before and suffered periods of unconsciousness as a result thereof. She was brought to the hospital by ambulance and was admitted in a semiconscious condition. The hospital records disclose that she was in a post-convulsive state, thrashing about and her reactions to questions asked were characterized as ‘1 negativistic. ’ ’ She was placed in a private room in Ryon Hall, a psychiatric ward, because of her tendency toward seizures and the hospital’s concern for the other patients. At this time, claimant was extremely obese and very heavy. *370 After her admission, claimant experienced a grand mal seizure about 11:00 a.m. — approximately three hours after her admission.
She was then transferred to Cheney Memorial, a medical-surgical ward, but was returned to Ryon Hall, about 3:00 p.m. on the 21st in a lethargic condition apparently due to the influence of the medication prescribed. She suffered a further seizure at about 5:30 p.m. on the 21st, her second of the day.
The room in Ryon Hall, in which claimant was placed, was a private room furnished with a hospital bed only. The bed was the customary hospital bed, on wheels, with a high mattress level and side rails which could be raised and lowered as the needs required, by swinging the sides out and up or down. When in the “up” position, the rails could be set into such position by a thumb screw arrangement at the head area of the bed.
In the wall opposite from the entrance door was located a window, and below the window was a steam heat, fin-type radiator with steam entering into it from the basement. The bed was located parallel to and against one of the side walls of the room, with the head of the bed toward the outside wall containing the window and the foot of the bed towards the door. The door to the room remained open so that observations of the interior could be made from the area outside the door.
During the night of January 22-23 and particularly in the early hours of the 23d, claimant had been given the prescribed medications, but was restless and thrashing about in her bed. The nurses on duty had been told of claimant’s condition and that they should keep close watch over her. During that night and early morning claimant kept unscrewing the side rails and let them slam down. Staff members on duty that morning and who checked on her very frequently would then come in and raise and rescrew the side rails. As the door to her room was kept open, staff members could look in as they passed by while going to attend other patients. At about 6:10 a.m. on the 23d and after she had been checked only 10 minutes before, claimant was found with her bed turned about in the room so that the side normally against the side wall was against the outside wall and both side rails down. Claimant was lying prone across the head of the bed and was experiencing a seizure. Her head was up against the window, part of her back was on the windowsill and top of the radiator and the lower part of her body and her feet across the bed. A part of claimant’s back was being-burned because of its contact with the upper part of the radiator which was between the upper surface of the bed and the window *371 sill. The nurse, a female of average weight and size, who found her thus, tried to pull claimant toward her and away from the radiator but could not lift claimant because of claimant’s unusual weight. This nurse then attempted to move the bed in order to draw claimant’s back away from, the top of the radiator. As the bed moved away from the wall, claimant fell to the floor between the bed and the wall, with all of her back and the back portions of her upper arms up against the side of the radiator. The nurse tried to pull her away from such position, but could not because of claimant’s weight and because claimant had wet the floor. Another nurse was called who assisted in pulling claimant away from the radiator sufficiently to insert a pillow between her back and the radiator. Then, with further help of other staff members, claimant was placed on the bed. It was then found that claimant had sustained serious burns on her back and the backs of both arms due to her contact with the radiator. Further details concerning the events surrounding this accident will be discussed later in this decision.
After this accident, skin grafting work was done at the hospital and claimant’s back was repaired with good results.
Claimant, through her parents, brought this claim for permanent injuries claiming damages in the amount of a quarter of a million dollars. The title of the action was changed on the trial, as previously set forth.
The claim was timely filed and has not been assigned or submitted to any other court or tribunal for determination. It is alleged that the injuries sustained by the claimant were caused by the negligence of the defendant in that the defendant, knowing and seeing the incapacity and inability of claimant to care for herself and knowing claimant’s proclivity for seizures, left claimant in an unguarded room, alone in bed, with inadequate supervision or attendance. The claimant, in her written claim, stated that she relies upon the doctrine or rule of res ipsa loquitur. At the trial, her counsel indicated that they would rely on an approach of specific acts of negligence on the part of the defendant. The court will consider both approaches.
The rule of res ipsa loquitur permits the inference of negligence to be drawn if the instrumentality causing the injury to the claimant was in the exclusive possession and control of the person charged with negligence and the accident would not ordinarily have occurred without neglect of some duty owed to the plaintiff (Abbott v. Page Airways, 23 N Y 2d 502).
The principle of res ipsa loquitur cannot be relied upon, however, if the proof adduced by the claimant actually refutes or negates the inference which might otherwise have been drawn *372 from application of the doctrine (Abbott v. Page Airways, supra). The fact that claimant introduces specific evidence of defendant’s negligence, however, does not forego reliance upon the res ipsa rule. Claimant does not have to choose between res ipsa and specific evidence of negligence, unless the alternate modes of proof are inherently inconsistent. “ The res ipsa case differs from the conventional case in one respect only — that, among all the possible causes of the injury, those which point to the defendant’s negligence are so probable, in view of the circumstances of the accident, and those which would exonerate him are so improbable, that it is unnecessary to specify the one that actually led to the occurrence.” (Abbott v. Page Airways, supra, pp. 512-513.)
To invoke the doctrine of res ipsa loquitur, it is necessary to establish that the instrumentality which caused the injury was in the defendant’s exclusive control and that common experience would show that the accident would not have happened unless there was negligence in the operation or control of the agency. (George Foltis, Inc. v. City of New York, 287 N. Y. 108; Barry v. State of New York, 27 A D 2d 593.) The doctrine raises an inference of negligence which the defendant may counter with evidence related to the instrument which caused the accident (Baskevich v. State of New York, 22 A D 2d 751). If the inference is countered by defendant, claimant in rebuttal must show negligence or lose the case. (See 1 Warren’s Negligence, p. 261, § 5.06, Shifting Burden of Proof.) On the whole case, there must be a preponderance of evidence in favor of claimant’s contention. There is required proof in applying the doctrine “ ‘ of absence of any action on the part of the plaintiff contributing to the accident ’ ” (Minotti v. State of New York, 6 AD 2d 990).
The physician in charge of Ryon Hall testified that claimant had a psychosis due to epilepsy, that she was a mental defective, and that these conditions were known to the hospital by reason of her previous admissions.
The nurse who was on duty the evening and morning of January 22-23 testified that she periodically checked claimant’s room as often as every 10 to 15 minutes, that she secured the side rails in the raised position but that claimant would then manage to drop them, that on several occasions, she entered the room and again affixed the side rails, that claimant was advised not to drop the side rails or to change their positions, to which directions claimant responded ‘ ‘ yes ’ ’, and that the door to claimant’s room was kept open all the time for observation.
*373 The hospital record discloses that about three hours after her admission, or about 11:00 a.m. on the 21st, claimant had a seizure and that she had a further seizure about 5:30 p.m. of the same day. The record also discloses that at 6:30 a.m. on the 22d, claimant was given medication (sodium amytol). To administer the medication by means of a hypodermic needle, it was necessary, because of claimant’s obesity, for the nurse to have the assistance of two others in turning claimant. No seizures, other than the two which occurred on the 21st, were noted. Anti-convulsive medication was administered, the last one in the record being on January 22d at about 8:00 p.m., but one of the nurses on duty during the night of January 22-23 insisted that she administered sodium amytol at 12:30 a.m. on January 23d • — which was about five and one-half hours before the accident.
Early in the morning of January 23d — about 6:10 a.m. — a nurse while walking another patient, looked into claimant’s room through the open door. She said that the position of the bed had been changed, that claimant was lying across the head of the bed with her head against the window and the rest of her body partly on the bed and partly against the windowsill, and that both side rails were in the down position. Claimant, she testified, was then suffering a seizure.
The nurse immediately took her patient to a sitting room and ran back to claimant’s room where she tried to pull claimant toward her and away from the windowsill and away from the top of the radiator which was between the bed and the windowsill. She was unable to do so because of claimant’s weight. The nurse then grasped the bed and pulled it away from the wall. Claimant fell from the bed and windowsill into a sitting position with her back up against the radiator. The nurse swung the bed around, went behind it and tried to pull claimant away from the radiator where claimant was shaking and kicking as she was still suffering a seizure. The nurse could not budge claimant because of claimant’s weight and because claimant had wet the floor. This nurse then called for another nurse to assist. The two tried and were unsuccessful. Then they succeeded in putting a pillow between claimant’s back and the radiator. After this they tried again and were successful in pulling claimant from the radiator. However, to replace claimant in the bed, additional personnel had to be called to assist.
The State is required to furnish such reasonable care and attention to its patients as their condition may warrant; but the State is not an insurer (Excelsior Ins. Co. of N. Y. v. State of New York, 296 N. Y. 40; Flaherty v. State of New York 296 N. Y. 342). The degree of reasonableness to which the State *374 must adhere in order to protect its patients should be measured by its anticipation of injuries which could occur in light of the particular patient’s physical and mental ills and deficiencies, paying such attention to their safety as their mental and physical condition may require and as known to the officers and employees of the institution (Zajaczkowski v. State of New York, 189 Misc. 299, 302; 27 N. Y. Jur., Hospitals and Asylums, §§ 86 and 87; Levy v. State of New York, Claim No. 46933). The risk reasonably to be perceived defines the duty to be obeyed (Palsgraf v. Long Is. R. R. Co., 248 N. Y. 339, 344).
The room to which claimant was admitted in Ryon Hall and the bed in which she was placed were, admittedly, in the exclusive control of the defendant. The bed, with the claimant in it, was placed in a position parallel to a side wall and away from the radiator and window on the outside wall. The side rails of the bed were affixed in the up position, but no restraints were placed upon the person of the claimant as the medical practice would be against mechanical restraints as testified to by the physician in charge of Ryon Hall. No physician ordered restraints in claimant’s case while she was in Ryon Hall. This was a medical judgment for which the State is not liable if in error (Rodriguez v. State of New York, 12 A D 2d 710). The medical policy for the treatment of epileptic patients set by the physicians in charge of Ryon Hall was one of not using restraints which- they felt created fear and restlessness with such patients and tended to increase the severity and incidence of convulsions. Hence, the policy not to permanently affix the bed rails, and of having open doors, unbarred windows, and the mobile bed.
Expert testimony indicated that the bed could be moved only by the application of force against it; and that a person sitting in the bed could not jiggle or move the bed into the position where it was found by the nurse. The only conclusions to be drawn, therefore, are that claimant, on one of her several exits from the bed, moved the bed herself to a position in front of the window and near the radiator and that she herself let the side rails down — both of which conditions were necessary to make possible the accident and the injuries which claimant sustained. Claimant having done these things, the ease is removed from the doctrine of res ipsa loquitur, because the defendant did not have exclusive control of the instrumentalities involved; rather, claimant’s actions intervened and played significant roles in making possible the event in which she sustained her injuries. Although the hospital record does bear a notation of 11 mental defective ’ there was no evidence intro *375 duced to indicate that claimant did not have the mental capacity to understand the operation of the bed and the instructions not to lower the side rails. There was, in fact, testimony that she had had gainful employment of a marginal nature. The evidence and the court’s observation of her showed a girl who was a mental defective, subject to seizures, but with understanding and with some competency.
Claimant introduced evidence which she claims indicates several kinds of negligence on behalf of the defendant, which the court now considers. As to her claim that she should have had constant and undivided supervision, the court finds that the State cannot be charged with a duty to provide a separate employee who would be assigned solely to watch every, move made by the claimant (Hirsh v. State of New York, 8 N Y 2d 125). However, by reason of claimant’s known physical condition, a close watch was necessary. This the State did, by keeping a constant check on claimant, every 10 minutes or so, and replacing the side rails time and again and warning claimant not to lower them, all in pursuance of the medical policy of the ward.
Claimant also introduced medical evidence to the effect that, since epileptics are in danger of falling, they should not be kept in beds or in beds with wheels, but on mattresses on the floor. This was countered by medical evidence on behalf of the State that keeping epileptics on mattresses on the floor was not good and accepted medical practice and that beds with wheels promoted better opportunities for care, especially when patients suffered attacks and required quick attention.
A third ground advanced by claimant was that an epileptic should not be kept in a room with an uncovered, steam heat, fin-type radiator. No previous accident of a similar nature was proved with the exception that one of the doctors testified that he recalled that some 30 years ago a patient did come in contact with such a radiator. This the court does not regard as a prior notice to the State of a danger that an epileptic might move her bed, get into or fall across it, and thus come in contact with a hot radiator as occurred here. In any event, the court does not find that good and accepted medical practice would require that all fin-type steam heat radiators in State hospitals in which epileptics are patients be covered or replaced by another form or system of heating.
A fourth argument of negligence advanced by claimant was that claimant should have been placed in a nearby “ security ” type room where the radiator had a cover. This, the State countered, was not the type of room that good and accepted *376 medical practice approved for an epileptic — it had the indicia of restraint which the doctors in charge did not approve for epileptics and which they testified was not good and accepted medical practice.
A fifth argument was that claimant should have been restrained and tied down by bindings. Here again the State countered that it was not good and accepted medical practice to restrain epileptics in this way- — that restraints create tension which is the very thing which doctors who specialize in treating epileptics seek to eliminate in their treatment of such patients.
Still another point concerning lack of adequate care made at the trial by claimant’s medical expert was that, in view of her restlessness and activity, she should have been given a stronger dose of sodium amytol than was given to her and this should have been by the intravenous method in order that it take effect more quickly. The State countered that sodium amytol was an extremely strong drug and that a stronger dose would have been dangerous. Furthermore, once given, the method of administration could not be changed even if immediate quieting results were not obtained. The court finds this to be a matter of medical judgment for which the State cannot be held responsible.
When the nurse returned to the room and saw the claimant suffering a seizure and lying against the window and the radiator, she tried to pull claimant away but could not. The nurse was then faced with an emergency situation, an emergency being-defined as a sudden or unexpected occurrence or condition calling for immediate action (Brooklyn City R. R. Co. v. Whalen, 191 App. Div. 737, affd. 229 N. Y. 570; 1 Warren’s Negligence, p. 157, § 14). Faced with an emergency, the person called upon to act is not -obligated to exercise the best judgment, and an error of judgment, even if unfortunate, does not make it negligent (Rowlands v. Parks, 2 N Y 2d 64). This rule, however, does not apply where the emergency results from -the negligent act of the party charged (Van Ingen v. Jewish Hosp. of Brooklyn, 182 App. Div. 10, affd. 227 N.Y. 665). No such negligent act upon the part of the State has been shown to have occurred here and the court finds that no such act did occur.
The nurse coping with the emergency situation, pulled the bed with the desire and expectation of pulling claimant away from the radiator. The contrary resulted when claimant fell to the floor and against the radiator. The court finds that the nurse acted in a reasonable course of conduct and time in her attempt to effect a rescue (Provenzo v. Sam, 23 N Y 2d 256).
The defendant, from the time of claimant’s admission to the hospital, prescribed a course of treatment, care and supervision *377 which was in accordance with qualified, competent and experienced medical opinion and judgment and with good and accepted medical practice. Claimant, under anticonvulsive medication, did not suffer an additional attack for over a period of 36 hours — January 21 at about 5:30 p.m. to the time of the accident at about 6:00 a.m. on January 23. Her care and supervision, as previously set forth, were in keeping with good and accepted medical practice, authority and judgment. Nor could the State reasonably have foreseen the regrettable and serious accident, which was dependent upon the unforeseeable and unlikely events of the claimant herself moving the bed from parallel with the side wall to parallel with the outside wall and of her getting or falling into a position across the head of the bed where her back would come into contact with the top of the radiator (cf. McPartland v. State of New York, 277 App. Div. 103, mot. for lv. to app. den. 277 App. Div. 1063). In the court’s opinion, fault cannot be assessed against the State for decisions as to treatment which were based on medical judgment of qualified personnel and only could lie against the State in the instant claim if the State’s employees, when faced with the emergency situation of claimant’s position across the bed and windowsill and against the hot radiator, failed to act properly. As set forth above, the court finds that the nurses acted in a reasonable and appropriate course of conduct in their attempt to cope with the emergency and to effect a rescue. Having acted reasonably, no fault can be attributed to the State because of the manner of their response to the unexpected emergency which confronted them and the claim must be dismissed.