WILLARD B. HORTON et al., Respondents, v NIAGARA FALLS MEMORIAL MEDICAL CENTER, Appellant.

Fourth Department, February 13, 1976

*Findlay, Hackett, Reid & Wattengel (Paul Reid, Jr.,* of counsel), for appellant.

*Grossman & Levine (Terry D. Smith* of counsel), for respondents.

SIMONS, J.P. Defendant appeals from a judgment awarding compensatory and derivative damages to plaintiffs for personal injuries resulting from Willard Horton's fall from defendant's second-story hospital window. On the day before the fall Mr. Horton had been admitted to the hospital, suffering from a "fever of undetermined origin" (subsequently diagnosed as pneumonitis) and observed to be acutely ill, "lacking in co-ordination" and suffering from blurred vision.

He was placed in a private room which had a single window opening onto a small balcony which was encircled by a railing two to three feet high. The nurses' notes on the day of the accident indicated that the patient "appears weak and dizzy,

is unable to focus, left side of face twitching, confused at times." Mrs. Horton visited her husband that morning and found him vague, confused and unresponsive to her questions. Mrs Horton's mother stayed with him until he was given a hypo about 2:00 P.M. and testified that he was uncommunicative and restless. Mr. Horton has no recollection of the events in the hospital prior to his fall.

At about 3:30 P.M. Mr. Horton was observed by some construction workers below his room. He was standing in his pajamas on the balcony outside his room and calling to them for a ladder. The workers notified the hospital personnel who returned the patient to his room and place a posey belt and cloth wristlets on him as mild restraints. The incident was logged in the nurses' notes with the statement "patient confused".

The charge nurse on the floor called Mr. Horton's attending physician to advise him of the incident. The doctor's recollection was that he told the nurse to keep an eye on the patient, to keep him restrained, and that if the patient caused any more trouble, he would have to be put in a "quiet" (secured) room. The charge nurse then called Mrs. Horton at her place of work in Lewiston, a village about 20 minutes' drive from Niagara Falls, and suggested that she come to sit with Mr. Horton because none of the hospital staff were free to do so. Mrs. Horton said that she would call her mother who lived only 5 to 10 minutes distance from the hospital and ask her to go to the hospital immediately. She asked that someone watch Mr. Horton until her mother arrived, but the nurse advised that the hospital was understaffed and "we can't possibly do that". Mrs. Horton called her mother, who hurried the four or five blocks from her home to the hospital and arrived there just in time to see a group of construction workers and spectators surrounding something on the ground near the hospital building. She discovered later that the object of their attention was Mr. Horton, and that he had fallen from the second-story window of his room.

The rule requires that a private hospital is required to exercise reasonable care and diligence in safeguarding a patient, measured by the capacity of the patient to provide for his own safety (*Robertson v Towns Hosp.,* 178 App Div 285; see, also, *Santos v Unity Hosp.,* 301 NY 153; *Hendrickson v Hodkin,* 276 NY 252; *Murray v St. Mary's Hosp.,* 280 App Div

803; 27 NY Jur, Hospitals and Asylums, § 74; 2B Warren, Negligence, Hospitals, § 2, pp 221-222; and see generally Ann. 60 ALR3d 880, Hospital's Liability for Suicide of Patient).

Generally, a hospital is entitled to act upon the doctor's orders for his patient in medical matters *(Toth v Community Hosp. at Glen Cove,* 22 NY2d 255, 264-265; *Mulligan v Wetchler,* 39 AD2d 102, 105, app dsmd 30 NY2d 951; *Garzione v Vassar Bros. Hosp.,* 36 AD2d 390, 392, affd 30 NY2d 857; cf. *Hendrickson v Hodkin, supra)* and, as defendant notes, the use of restraints is usually considered to be a medical decision *(Mossmand v Albany Med. Center,* 34 AD2d 263, 264; *Wendover v State of New York,* 63 Misc 2d 368; cf. *Haber v Cross County Hosp.,* 37 NY2d 888). Relying upon this rule, defendant contends that since plaintiff's attending physician approved the posey belt and wristlets and since no damage was observed during periodic checks of the patient for temperature taking at 4:00 P.M. and by nurses passing his room during rounds, the actions of the hospital employees were reasonable under all the circumstances. However, while the fact that the hospital staff followed the instructions of the patient's attending physician on the use of restraints may protect the hospital from liability on that issue (assuming the physician was fully informed and that the hospital had no reason to believe that the care provided was inadequate), it is not conclusive in matters in which the hospital has a separate and independent duty to the patient. The duty of the hospital to supervise the patient and prevent him from injuring himself remained, even after the physician's instructions were given, and the court's charge properly instructed the jury on this responsibility.

The question then is what reasonable care was required in the way of supervision, considering the nature of the hospital and its facilities, the personnel available either by way of staff, private duty nurses or relatives, and the knowledge the hospital had of the patient's propensities to inflict injury upon himself (and even though, as defendant contends, the patient's conduct may not have been suicidal [see *Van Patter v Towns Hosp.,* 246 NY 646; *Robertson v Towns Hosp., 178 App Div 285, supra;* Ann. 60 ALR3d 880, *supra,* § 11 subds (a), (b)]). Competent proof of the general standards of hospital care common in the community under these circumstances was properly received as evidence of defendant's negligence *(Hnat v Nyack Hosp.,* 33 NY2d 985; *Judd v Park Ave. Hosp.,* 37 Misc 2d 614, affd 18 AD2d 766; *Liebrecht v Gotham Sanitarium,*

284 App Div 781; Ann. 36 ALR 3d 440, Hospital—Care Standard—Locality Rule).

Applying these rules, it is apparent that plaintiffs presented sufficient evidence to entitle them to go to the jury on the question of negligence and to support the jury's finding in their favor. Under the circumstances the hospital employees had three apparent courses of action available, to move Mr. Horton to a secure room, to apply additional restraints (under hospital rules these actions could be taken without a doctor's order in cases involving an emergency), or to find someone to watch Mr. Horton until his mother-in-law arrived.[1]

When Mr. Horton was returned to his room at 3:30 P.M., he was docile but to the knowledge of the hospital personnel he remained confused and disoriented, and the attending physician advised the nurse to keep the patient under restraint and keep an eye on him. At the time of this incident there were 19 patients in the wing of the hospital (a fully occupied 10-bed ward and 9 private rooms, including Mr. Horton). The regular staff included a charge nurse, a practical nurse, and an aide. In addition there was a new registered nurse assigned to the charge nurse to learn the hospital routine and orderlies were available on call for temporary help from other sections of the hospital. At the time of the accident all the personnel on the floor were engaged in routine duties, taking temperatures or reviewing charts, duties which could have been delayed without interfering with the general operation of the wing. Shortly before Mr. Horton injured himself, the aide assigned to this section was permitted to leave for supper, although it was within the charge nurse's authority to delay the employee's meal break. This was during the period of time when the charge nurse had advised Mrs. Horton that she could not spare any help from hospital duties to watch Mr. Horton until Mrs. Horton's mother arrived. The jury could find that the hospital had the personnel to provide continuous supervision for the 10 to 15 minutes required before Mr. Horton's mother-in-law arrived and that it was negligent in failing to do so (see, e.g., *Elliott v Tempkin,* 32 AD2d 531).

Defendant also urges that Mr. Horton was guilty of contributory negligence as a matter of law. It cites our decision in *Mochen v State of New York* (43 AD2d 484) in support of its

---

1. There was no obligation to provide 24-hour supervision (see *Hirsh v State of New York,* 8 NY2d 125; *Fernandez v State of New York,* 45 AD2d 125).

contention, alleging that Mr. Horton's act was voluntary and that absent expert opinion evidence that he was unable to comprehend or avoid the danger of his acts, he is barred from recovering by his own negligence.

In *Mochen* we reviewed a finding of contributory negligence made by the Court of Claims sitting without a jury. We held in that case that the care which a mentally ill patient must exercise to protect himself is not based upon the objective standards of the reasonable man, but rather it is based upon the capacity of the claimant and his perception of danger, considering the degree of his illness. We recognized that in "all but the clearest cases" the determination of contributory negligence under that standard was one of fact, and exercising our power to find facts upon the record in a nonjury case (see *Guth Realty v Gingold,* 41 AD2d 479, 482, affd 34 NY2d 440), we held that the plaintiff was not chargeable with contributory negligence.

This case does not involve a plaintiff who may appear outwardly aware of his surroundings and their potential dangers, but who is suffering from mental illness which distorts his view of reality. In such cases expert proof of the fact and nature of the plaintiff's mental illness may be required before his actions may be characterized. This plaintiff was suffering a common physical illness, which nurses, doctors, and lay persons testified had confused and disoriented him. His conduct was to be judged by that of others suffering similar disabilities (cf. *Plunkett v Brooklyn Heights R.R. Co.,* 129 App Div 572, affd 198 NY 568; *Harris v Uebelhoer,* 75 NY 169), and the record contained sufficient evidence upon which the jury could make its decision on the issue of contributory negligence.

Finally, defendant contends that the court incorrectly granted an additional challenge to plaintiff in the jury selection process. In the absence of a record of the questions and answers during the *voir dire,* we are unable to determine the issue, and find it is not cause for reversal.

The judgment and the order denying defendant's motion for a new trial should be affirmed.

DILLON, GOLDMAN and WITMER, JJ., concur.

Judgment unanimously affirmed, with costs.