Rankin G. MILLER, Plaintiff and Appellant,

v.

TRINITY MEDICAL CENTER, a North Dakota Hospital Corporation, Defendant and Appellee.

Civ. No. 9352.

Supreme Court of North Dakota.

Nov. 10, 1977.

Jonathan C. Eaton, Jr., of Eaton & Van De Streek, Minot, for plaintiff and appellant.

Robert W. Palda, of Palda & Thomas, Minot, for defendant and appellee.

VOGEL, Justice.

This is an appeal by the plaintiff, Rankin G. Miller, from a judgment of the district court of Ward County finding the plaintiff and the defendant, Trinity Medical Center,

equally negligent in causing a fire in Miller's bed while he was hospitalized in Trinity's facility. Because of findings of 50 percent negligence on the part of the plaintiff and 50 percent on the part of the defendant, recovery by the plaintiff was precluded under North Dakota's comparative negligence statute, Section 9–10–07, North Dakota Century Code, which allows recovery only if the plaintiff's negligence "was not as great as the negligence of the person against whom recovery is sought, . . ."

On appeal, Miller claims that the trial court's findings are inconsistent, contradictory, and clearly erroneous.

This appeal raises serious questions as to the degree of care required of hospitals caring for patients who are mentally confused, and the standards to be applied to mentally confused patients in determining whether they are contributorily negligent.

We affirm.

Miller was admitted to the hospital on October 31, 1974. He was 74 years of age and was described as "somewhat confused, with partial kidney failure, gallbladder trouble, and recent loss of weight." On November 7, 1974, his hospital gown caught fire, apparently from a pipe he was smoking. First-, second-, and third-degree burns resulted, requiring a skin graft and leaving him with restricted movement in his right arm. He also has permanent scarring.

Prior to the fire, Miller was given a maintenance dosage of Mellaril, described as a mild sedative. His last administration of Mellaril was 15 minutes before the fire. He had not received a sleeping pill that evening. He also was given Demerol after meals and at bedtime.

A nurse's aide discovered the fire and testified that Miller did not appear frightened and did not show signs of pain, but was aware that there was a fire.

At the trial Miller testified that he had no recollection of how his burns were incurred. On cross-examination he testified that he felt some responsibility for his burns but also felt the hospital should not have allowed him to smoke in bed.

There was considerable testimony as to the smoking policy of the hospital. Patients were classified, usually by the head nurse or the doctor, in one of three categories: (1) patients who were not permitted to smoke under any circumstances (including patients who were heavily sedated); (2) patients who were under no restrictions as to smoking; and (3) patients who were allowed to smoke only if some responsible person sat with them while they smoked. Smoking materials for the third category of patients were kept locked at the nurses' station. The hospital records contain no indication that Miller was restricted as to smoking. However, a nurse's aide testified that she would sit with him while he smoked and would take his smoking materials to the nurses' station. The medications nurse indicated that it was against her policy to permit a patient to smoke in bed after he had been given Mellaril. She had seen him smoking on November 6, but had seen no smoking materials when she gave him his medication on November 7. Miller's attending physician testified that it was his policy not to permit a markedly confused patient to smoke, but he did allow slightly confused patients to smoke if there was someone with them. The attending physician testified that he did not believe smoking would be hazardous to Miller and placed no restrictions on his smoking.

At times during his hospitalization, Miller was restrained to prevent him from getting out of bed and wandering around or falling out of bed.

The attending physician testified that drowsiness is a symptom displayed in some persons after administration of Mellaril, but that the dosage received by Miller would not create a hazard so far as smoking was concerned.

The trial judge made complete findings of fact. He found the hospital negligent for failure to take measures to prevent, or at least supervise and control, Miller's use of his pipe while in the hospital; that Miller was negligent in his use of the pipe while smoking in bed; that the negligence of each

was equal; that the total hospital costs and doctor bills were $13,141.30 (including those paid by Medicare, from which the expenses prior to the fire were to be deducted); that $10,000 would compensate Miller for his pain and suffering; and that Miller, on cross-examination, testified to feeling some responsibility for his own injuries. The court quoted *Verry v. Murphy*, 163 N.W.2d 721, 735 (N.D.1969), as follows:

> ". . . a party cannot claim the benefit of a version of relevant facts more favorable to him than he has made for himself by his own testimony."

Miller contends that he should not be found negligent since one cannot be negligent without either actual or constructive knowledge of the danger and an understanding of what he is doing, and that the trial court failed to recognize the proper rule as to the hospital's duty of care of confused patients.

■ Issues of negligence, proximate cause, and contributory negligence ordinarily are questions of fact for the trier of fact unless the evidence is such that reasonable minds can draw but one conclusion, and the findings of fact by the trial court will not be set aside on appeal unless clearly erroneous. *Kresel v. Giese*, 231 N.W.2d 780 (N.D. 1975); *McKechnie v. O'Neil*, 252 N.W.2d 875 (N.D.1977).

We now consider whether or not the trial court correctly applied the law, and in doing so must consider the duty of the hospital toward the patient and the patient's duty toward himself.

The duty of a hospital has been variously stated. One formulation is that hospitals must use the care which is exercised by hospitals generally or by hospitals in the particular community or in communities similar to it. This standard usually has been held to apply in cases involving professional services by a hospital. *Dickinson v. Mailliard*, 175 N.W.2d 588 (Iowa 1970); *Foley v. Bishop Clarkson Memorial Hospital*, 185 Neb. 89, 173 N.W.2d 881 (1970). Other decisions have held that the standard applicable to hospitals is "reasonable care for the protection and well-being of the patient commensurate with its actual or constructive knowledge of the patient's physical and mental condition." *Trepanier v. McKenna*, 267 Minn. 145, 125 N.W.2d 603, 606 (1963); *Warner v. Kiowa County Hospital Authority*, 551 P.2d 1179 (Okl.App.1976). The New York Court of Appeals restated this rule as requiring a private hospital "to exercise reasonable care and diligence in safeguarding a patient, measured by the capacity of the patient to provide for his own safety." *Horton v. Niagara Falls Memorial Medical Center*, 51 A.D.2d 152, 380 N.Y.S.2d 116, 119 (1975). This second standard has been applied in cases involving nonmedical, administrative, ministerial, or routine-care cases. *Kastler v. Iowa Methodist Hospital*, 193 N.W.2d 98 (Iowa 1971); *Schuster v. St. Vincent Hospital*, 45 Wis.2d 135, 172 N.W.2d 421 (1969).

■ We adopt the second rule as applicable in this case, and therefore hold that the hospital was required to exercise such care as the hospital knew or should have known Miller's mental and physical condition reasonably required. The evidence we have briefly outlined amply supports the trial court's finding of negligence on the part of the hospital. In fact, the hospital, by not cross-appealing, does not contest its negligence.

As to the degree of care required of the patient as to his own safety, some early cases followed a rule that a plaintiff who is not "totally" insane or "absolutely devoid of intelligence" is held to the same degree of care respecting contributory negligence as that required of a normal person. *Worthington v. Mencer*, 96 Ala. 310, 11 So. 72 (1892); *Johnson v. Texas & P. Ry. Co.*, 16 La.App. 464, 133 So. 517 (1931). Recent cases have taken the position that a diminished mental capacity not amounting to total insanity may be taken into consideration in determining whether the plaintiff has exercised the requisite degree of care for his own safety. *Mochen v. State*, 43 A.D.2d 484, 352 N.Y.S.2d 290 (1974); *Fox v. City and County of San Francisco*, 47 Cal.App.3d 164, 120 Cal.Rptr. 779 (1975). Under this

view, a court may differentiate among varying levels of mental disability and determine the standard of care required by persons under the same or similar circumstances. In *Mochen v. State, supra,* the New York court applied such an analysis and stated:

"Considering the present state of medical knowledge, it is possible and practical to evaluate the degrees of mental acuity and correlate them with legal responsibility. Within the broad spectrum of scientifically differentiated mental illnesses, there are intermediate levels of disability which may interfere with the perception of danger or the free exercise of judgment to avoid danger to such a degree that a mentally sick plaintiff suffering such an infirmity should be excused from responsibility for his own injury." 352 N.Y.S.2d 290, at 293 (1974).

And in *Horton v. Niagara Falls Memorial Medical Center, supra,* the New York court reiterated its holding in *Mochen* that

". . . the care which a mentally ill patient must exercise to protect himself is not based upon the objective standards of the reasonable man, but rather it is based upon the capacity of the claimant and his perception of danger, considering the degree of his illness." 380 N.Y.S.2d 116 at 121–122.

While the record before us is not completely clear as to Miller's mental condition at the time of the injury or immediately prior to it, sufficient facts are presented from which the court could conclude that Miller's mental confusion did not completely interfere with his perception of danger or his exercise of judgment to avoid danger.

In addition to the testimony mentioned previously, there is testimony that Miller had smoked in the hospital earlier and seemed to handle his smoking satisfactorily, and that he was alert when observed to be smoking.

We are somewhat troubled by the degree of emphasis which the trial court placed upon Miller's testimony on cross-examination, particularly his admission that he felt responsible to some extent for his own injury. Such testimony, standing alone, is not conclusive as an admission of legal liability. A layman may use the word "responsible" in the sense of causation in fact, as distinguished from proximate cause in law. As we said in *Bertsch v. Zahn,* 141 N.W.2d 792, 795 (N.D.1966):

"Furthermore, we know from experience that what an individual concludes is his fault may not in the eyes of the law be his fault."

See also *Klein v. Harper,* 186 N.W.2d 426, 432–433 (N.D.1971).

However, we conclude that the trial court's emphasis on the admission of Miller is not a ruling of law, but only a reference to a fact to which it gave some weight. Miller's testimony was clearly admissible [Rule 801, N.D.R.Ev.], and the weight to be given to it is a matter of judgment of the trier of fact.

We have reviewed the findings of fact and the record and conclude that there is substantial and credible evidence to support each of the trial court's findings of fact, and we are not left with a definite and firm conviction that a mistake has been made. *In re Estate of Elmer,* 210 N.W.2d 815 (N.D.1973). We might have assigned different percentages of negligence to each party, but we do not try cases de novo.

We find no error of law and no finding of fact which is clearly erroneous, and we therefore affirm the judgment.

ERICKSTAD, C. J., and PEDERSON, PAULSON and SAND, JJ., concur.