OPINION OF THE COURT
Thomas J. Lowery, J.
The claimant, while a patient at the Hutchings Psychiatric Center, sustained personal injuries on October 20, 1976, when he jumped from a second-story window of the facility. It is alleged that the injuries occurred as a result of the State’s negligence in failing to provide the claimant with an adequate level of custodial care and supervision. The claim was bifurcated and tried on the issue of the State’s liability.
The claimant had a long history of psychiatric problems. He had episodes of psychotic behavior in the past and had attempted to commit suicide on at least two occasions. For the four-year period prior to his admission to Hutchings, he had been under the care of Dr. David B. Robinson, a noted psychiatrist in the area. In mid-September of 1976, Dr. Robinson became concerned with the claimant’s condition. This concern centered upon his observation that the claim *1025 ant was becoming increasingly depressed and dependent upon Valium. After consultation with the claimant, the doctor arranged to have him voluntarily committed to Hutchings. The application for admission was made on October 7, 1976 and the following day he entered the facility.
Upon arrival at Hutchings, the claimant was evaluated by the admission staff. The staff recommended that he be admitted as an inpatient because he was considered to be a suicide risk. The claimant was then assigned to “Team D”, the facility’s unit for the acutely ill.[1] There he came under the care of Dr. Laura Yelinek, the staff psychiatrist for the unit.
Prior to evaluating the claimant, Dr. Yelinek discussed the claimant’s history with Dr. Robinson. He suggested the use of certain antidepressant medication. He warned, however, that a cover drug should be used to prevent the danger of drug-induced psychosis. He noted, that the risk was more pronounced where an individual had a history of psychotic behavior.
Thereafter, Dr. Yelinek evaluated the claimant and reviewed the records of the admission team. She determined that the claimant was experiencing suicidal ideations and was obviously depressed. She initially diagnosed his condition as “Borderline Personality”, but indicated that there was some possibility of his being neurotically depressed. This diagnosis was essentially the same as that of the admission team.
Dr. Yelinek then formulated a treatment plan. Its goal was to remedy the claimant’s depressed state and to wean him off his dependence on Valium. Because of his history of psychotic behavior, both a psychotropic[2] and an antidepressant[3] drug were chosen. The plan provided for the placement of the claimant on suicide precaution status because it was felt he was a danger to himself.
*1026 On October 12, 1976, the claimant was removed from suicide precaution status. At this time, he was transferred to a room on the second floor of the unit, where he remained on restricted status.[4] This action removed the high level of protection previously afforded the" claimant.
The following day the claimant was given an in-depth evaluation by Dr. Frank B. Soults, Clinical Director of the facility.[5] He observed that the claimant was anxious and complained of suicidal ideations. He characterized the claimant as being “seriously neurotically depressed, desperate, lonely and highly lethal.”
On October 15, 1976, after a discussion of the claimant’s condition with Dr. Soults, Dr. Yelinek changed her diagnosis from “Borderline Personality” to “Depressive Neurosis”. At this time, she formulated a new treatment plan. The plan provided for the discontinuance of the cover medication (Trilafon) and for doubling the dosage of the antidepressant medication (Elavil). Additionally, the plan included a direction to the staff to make observations of the claimant for any symptoms of drug-induced psychosis. It is noted that a similar order was contained in the nursing plan for the claimant.
The hospital record revealed that on October 17, 1976, the claimant requested that he be discharged from the facility. Dr. Yelinek believed that this was inadvisable because of his potential for suicide. Noting that the claimant was dangerous to himself, she decided to seek his formal commitment to the facility.
On October 19, 1976, the claimant placed a telephone call to Dr. Robinson. It appeared to the doctor that the claimant was very confused and terrified. He was unable to state where he was. Later, he revealed to Dr. Robinson that, at the time, he believed that he was in the Montezuma swamp and that people were after him. After receiving this call, Dr. Robinson immediately contacted Dr. Yelinek and told her of the claimant’s call. He told her that *1027 the claimant was psychotic. After learning that the cover medication had been withdrawn, he questioned her as to whether she believed that the claimant was being overwhelmed by the antidepressant drug. Dr. Yelinek thanked him for the call, but took no action.
At 2:00 a.m. on October 20, 1976, Robert Bolacker, a therapy aide, observed the claimant crawling on his hands and knees from his room. He told Mr. Bolacker that there was a bomb in his room and begged him not to enter. After a period of time, the therapy aide was able to calm the claimant and he later returned to his room. Mr. Bolacker testified that he reported this incident to the charge nurse, who was identified as Carmela Muoio. She denied receiving such information. In any event, neither informed Dr. Yelinek or any other psychiatrist on the staff of the incident.
At 4:00 a.m., the therapy aide Timothy Davenport took charge of the second floor. Although he was made aware of claimant’s previous conduct, he likewise took no action. Later that morning, at approximately 6:45 a.m., Mr. Davenport observed the claimant leaving his room fully dressed after a night of no sleep. At the time, the claimant appeared to be anxious and restless. He then observed the claimant proceed towards the first floor of the unit. Here he approached Ms. Muoio and requested permission to leave the unit. This request was denied, whereupon he returned to the second floor.
The claimant returned to the second floor at about 7:00 a.m. He then attempted to leave the unit by breaking through a second floor fire door. Mr. Davenport approached the claimant and attempted to ascertain what was bothering him. At this point, the claimant appeared to be very restless and agitated. The claimant next picked up an end table and smashed the picture window in the dayroom. Mr. Davenport attempted to intervene in order to prevent the claimant from jumping. His attempt was unsuccessful and the claimant jumped headfirst through the window, landing on a concrete patio below. The claimant was thereafter transported to Upstate Medical Center for treatment.
On trial, the claimant testified as to his mental state at the time he jumped through the window. He stated that he *1028 thought he was in a house on a hilltop. He thought that no one would let him leave and that he was being kept in a room without doors. He saw a window and thought he could escape. He remembers breaking the window and then thought he was way out on a portico. He was terrified and afraid of the police getting him.
The alleged negligence of the State in failing to provide the claimant with an adequate level of custodial care and supervision is premised on two grounds. First, the claimant contends that good medical practice mandated his return to suicide precaution status on October 13, 1976, when he was found to be highly lethal.
Dr. Yelinek admitted, at trial, that a finding of high lethality was a crisis situation. She also admitted that, given such a finding, acceptable medical practice mandated that the claimant be returned to suicide precaution status. Yet, despite Dr. Soults’ finding of “high lethality”, she did not return the claimant to such status. Her only excuse for this failure was that she did not recall being informed of Dr. Soults’ specific conclusions in this regard. The weight of the evidence, however, is to the contrary. Dr. Yelinek admitted in an examination before trial, and in the hospital record itself, that she was aware of Dr. Soults’ impressions. Further, she admitted that it was her responsibility to maintain the claimant’s lethality rate daily, once he had been taken off suicide precaution status. From the latter, it may be inferred that she specifically inquired as to Dr. Soults’ finding in this regard. Finally, subsequent to Dr. Soults’ examination, Dr. Yelinek changed her diagnosis of the claimant to “Depressive Neurosis”, which directly conformed with Dr. Soults’ impressions. In sum, the court finds that Dr. Yelinek knew of the claimant’s high lethality, but nevertheless, chose not to return the claimant to suicide precaution status. In view of Dr. Yelinek’s admissions and the testimony of the claimant’s expert, her conduct constituted professional malpractice. (See Pike v Honsinger, 155 NY 201.) Under the circumstances, the State may be held liable (see Liubowsky v State of New York, 260 App Div 416, affd 285 NY 701), if it can be shown that the malpractice was a proximate cause of the injuries sustained.
*1029 Although it may be said that Dr. Yelinek’s negligence in failing to restore the claimant to suicide precaution furnished the condition by which his injuries were made possible, it cannot be said that such negligence was the proximate cause of his injuries. (Cf. Rivera v City of New York, 11 NY2d 856; Gralton v Oliver, 277 App Div 449, affd 302 NY 864.) It is clear that the claimant was not intending to kill himself at the time he jumped from the window, but rather had lost all touch with reality and was acting under the influence of a drug-induced psychosis.[6] This being the case, the risk of attempted suicide was totally irrelevant to the happening of the accident herein, which was occasioned by an independent and intervening cause.
Next, the claimant asserts that the State failed to exercise due care in monitoring his condition, once it had been decided that the cover drug be removed. This, it is claimed, presented an unreasonable risk of injury in view of the foreseeable effects of drug-induced psychosis.
Preliminarily, the court notes that Dr. Yelinek’s decision to discontinue the use of the cover drug was questionable. This was particularly so with respect to the claimant, who had a history of psychotic behavior and was more prone to the side effects of the medication. This risk was acknowledged by Dr. Yelinek. Even if the court were to give Dr. Yelinek the benefit of the doubt and conclude that her decision was a matter of medical judgment only (see St. George v State of New York, 283 App Div 245, affd 308 NY 681), it is clear that this judgment was called into question when she was told by Dr. Robinson of the claimant’s psychotic behavior on October 19, 1976. Instead of acting on this information, she chose to do nothing. This conduct constituted negligence, which was a substantial factor in causing the claimant’s injury.
Moreover, it appears that there was an administrative failure that additionally contributed to the happening of the accident. This occurred when the State personnel failed to report the claimant’s bizarre behavior in the early *1030 morning hours of October 20, 1976.[7] This behavior indicated a marked deterioration of the claimant’s condition and called for a re-evaluation of his treatment plan. Under the circumstances, the failure to communicate this vital information constituted negligence, which also was a substantial factor in producing the claimant’s injuries. (See Homere v State of New York, 48 AD2d 442.)
In sum, the court finds that the State was negligent (see Hirsh v State of New York, 8 NY2d 125; Horton v Niagara Falls Mem. Med. Center, 51 AD2d 152; Zophy v State of New York, 27 AD2d 414), and such negligence was the proximate cause of the claimant’s injuries. Finally, the court finds that the claimant’s mental state precludes any findings of negligence on his part. (See Mochen v State of New York, 43 AD2d 484.)
Accordingly, the defendant’s motion to dismiss this claim is denied. Further, the claimant’s motion for judgment in his favor is granted, both on the law and on the facts. The clerk of this court is directed to enter an interlocutory judgment in favor of the claimant on the issue of liability and to restore this claim to the Trial Calendar for the trial on the issue of damages.

. The team concept of care was employed at Hutchings. Under such concept, the responsibility for the patient’s care was shared by a staff that included nurses, therapy aides, a team leader, and a staff psychiatrist. The Clinical Director of the facility also would, at times, participate in the patient’s care. Communication between team members was recognized as being vital.

. Phenothiazine perphenazine (Trilafon). Dosage prescribed: 40 mg., four times a day.

. Amitriptyline (Elavil). Dosage prescribed: 25 mg., four times a day.

. When a patient is on restricted status, he is prevented from leaving the living area, unless accompanied by a staff member.

. Dr. Soults was not called to testify, but his findings and conclusions were set forth in the hospital record. There was no proof, however, of when Dr. Soults’ written report was inserted in the hospital record.

. The court adopts the testimony of Dr. Robinson in this regard. Little weight can be given the testimony of the State’s expert, in view of the fact that his opinion was predicated only on a portion of the hospital record.

. It was admitted by the charge nurse on duty that night, that this type of behavior should have been reported to competent medical authority.