OPINION OF THE COURT
Stephen J. Mignano, J.
At the outset, the court is well aware that summary judg *65 ment is a drastic remedy to be granted sparingly and only where no material issues of fact are demonstrated in the papers related to the motion (see, Crowley’s Milk Co. v Klein, 24 AD2d 920 [3d Dept 1965]; Wanger v Zeh, 45 Misc 2d 93, affd 26 AD2d 729 [3d Dept 1966]).
The proponent of a summary judgment motion must make a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to demonstrate the absence of any material issues of fact (Winegrad v New York Univ. Med. Ctr., 64 NY2d 851, 853; Sillman v Twentieth Century-Fox Film Corp., 3 NY2d 395, 404). Failure to make such a prima facie showing requires a denial of the motion, regardless of the sufficiency of the opposing papers Winegrad v New York Univ. Med. Ctr., supra at 853).
The majority of the facts of this claim are uncontroverted. The evidence submitted in support of the motion established that claimant’s decedent, William E. Newborn, Jr., was an inmate in the custody of the New York State Department of Correctional Services (hereinafter DOCS) and was housed at Green Haven Correctional Facility (hereinafter Green Haven) in A block, cell 121 during the summer of 1997. Green Haven is a maximum security prison and A block houses inmates in protective custody (see exhibit 37). Decedent was serving several concurrent indeterminate sentences for automobile related crimes and was eligible for parole on September 15, 1997 (see exhibit 2).
Decedent had a history of mental health problems and treatment dating to 1985. On May 16, 1997 a DOCS senior correction counselor noted decedent’s rapid mood swings and poor disciplinary record and referred decedent for a psychiatric evaluation (see exhibit 67). Decedent was interviewed by a psychiatrist and was diagnosed with bi-polar II disorder, hypo-manic and anti-social personality disorder. He was designated for Office of Mental Health (hereinafter OMH) services as level one, the most intensive level of care for the purpose of medication monitoring by psychiatric/nursing staff (see exhibits 26, 67). Level one requires one-to-one administration of medication by a nurse (see exhibits 26, 56).
Decedent was seen regularly by mental health staff until the August 1, 1997 incident preceding his death. Progress notes of sessions with mental health clinicians reflect decedent’s impulsive behavior, rapid mood swings, suicidal and homicidal ideations, his intent to change from liquid medication to pill *66 form and his request to spend a few days in the psychiatric satellite unit (hereinafter PSU) at Green Haven to get some relief from the stress of incarceration (see exhibit 67 at 5).
Decedent was prescribed Pamelor (nortriptyline) for headaches on June 10, June 16, July 8, July 21 and July 29, 1997 (see exhibit 67 at 11). Pamelor is a tricyclic antidepressant commonly used for relief of depression (see exhibit 30, Physicians’ Desk Reference [hereinafter PDR]). Decedent appeared before the parole board in early July 1997. On July 19, 1997 he told a social worker that he would attempt suicide if the parole board denied him parole (see exhibit 67 at 9).
On July 24, 1997 decedent was seen by DOCS psychiatrist Dr. Choo in the PSU at Green Haven. During that interview, decedent reported having unstable mood swings for a long time. He expressed his past thoughts of killing himself and others because of these mood swings. He denied any intentions of killing himself or others at that time and agreed to request help from the PSU if he felt suicidal or homicidal. He also reported that he took some pills to help him sleep and reduce stress (see exhibit 67 at 9-10). On July 24, 1997 the doctor prescribed both Trilafon and Elavil to help decedent sleep. Elavil is a tricyclic drug of the same class as Pamelor (see exhibit 29). It is medically contraindicated to prescribe Elavil and Pamelor at the same time (see exhibit 30, PDR). By July 29, 1997 decedent knew he had been denied parole and had to serve at least two more years of his sentence (see exhibit 76, letter from decedent to claimant, dated July 29, 1997).
On July 31, 1997 decedent was seen by the mental health unit chief for supportive therapy. Decedent appeared more animated than on previous occasions and his mood was slightly improved. However, he had difficulty remembering his last mental health encounter. He reported that he refused medication because it upset his stomach. He requested to spend a few days in the PSU to get some relief from the stress and pressure on his cell block. Decedent was advised that he would have to speak with the doctor regarding this matter and that the unit chief would try to arrange a meeting for August 1, 1997. Progress notes dated August 1, 1997 (exhibit 12) reflect that “patient will be seen again today pm on call out scheduled asap” (see exhibit 67 at 10).
At about 12:50 p.m. on August 1, 1997 decedent told Correction Officer (C.O.) Henschel that he wanted to be ready to go to PSU when the escort officer arrived to take him. Therefore, he requested permission to leave the exercise yard early to return *67 to his cell (see exhibit 25). C.O. Henschel let decedent into his cell but refused to leave the door open, which the inmate wanted him to do in case the escort officer was late. When decedent became agitated at being locked in, Henschel said that he would give the escort 20 minutes and if the escort was late, Henschel would let decedent out (exhibit 13, Henschel mem). No escort officer arrived to take decedent to the OMH call out (exhibit 37).
At approximately 1:20 p.m., decedent began calling for the block officer. Since C.O. Henschel was busy, C.O. Trainee Schrader responded. When the officer, at the direction of C.O. Dienhoffer, refused to let decedent out of his cell, he allegedly became “wild,” yelled at the C.O.s and “trashed his cell.” According to an entry in the housing unit log, decedent “tore up his cell while waiting to see PSU doctor” (exhibit 38; see also exhibit 16 [Thacker mem]). C.O. Henschel, hearing the commotion, came to Newborn’s cell at about 1:35 p.m. and talked to him for about 20 minutes, calming him down (exhibit 13).
According to C.O. Henschel, during this talk, decedent slammed his forehead against the cell wall “several times very hard,” repeatedly punched his locker and cursed C.O. Trainee Schrader (exhibit 13). After decedent calmed down and straightened out his cell, in compliance with Henschel’s precondition, he was permitted to go to the yard (exhibit 13). Within 15 minutes, however, decedent complained that “they” would not leave him alone and asked to be returned to his cell (exhibit 33).
Decedent’s OMH record indicates an officer called the OMH clinic at 2:05 p.m. (exhibits 12, 67). An OMH nurse’s note records that the calling officer was instructed to tell the inmate that if an escort was unavailable, PSU would schedule him again in the morning. When the C.O. thereafter reported that the inmate was talking to himself and to “someone who wasn’t there” the nurse advised the C.O. to notify the sergeant to have the inmate escorted to PSU. It appears that this advice was not followed.
At approximately 2:00 p.m. another C.O. saw decedent grab something and put it to his mouth. The block officer observed decedent throwing an empty container to the floor. When questioned what it was, decedent told the officer it was pills for his headaches and to help him sleep. The inmate then laid down on the floor. Decedent was questioned several times as to what he ingested and he insisted he only took one pill. The C.O. noted that the empty bottle was dated July 30 and *68 originally contained 30 pills. The block officer called the clinic and was instructed to get the inmate to the clinic. Decedent walked with the escort officer to the clinic. At 3:00 p.m. decedent was examined by a doctor — BP was 120/80; p-88 (regular); r-20. The doctor ordered that decedent be transported to an outside hospital for monitoring. At 3:58 p.m. Sloper-Willen Ambulance Service received a call from the facility regarding an overdose and responded immediately. While awaiting for the ambulance, decedent was in a room adjacent to the clinic and was observed falling to the floor from his chair. He was snoring deeply. BP was 100/64; p-104 (regular); r-20, pupils equal and reactive to light. The inmate became combative when he was placed on the backboard.
Sloper-Willen arrived at the scene at 4:10 p.m. According to the prehospital care report, decedent was lying on the prison stretcher unconscious and unresponsive with snoring respirations. Decedent was given oxygen (10 LPM via face mask), placed on the ambulance stretcher and brought to the ambulance. A cardiac monitor was applied which showed sinus tachycardia with no ectopics. An IV was established in his left hand with an 18 gauge needle; blood drawn and IV sodium chloride “wide open” was administered. Vitals were monitored and inmate still had snoring respirations. The notes reflect D50 given by IV push, 2 mg Narcan IV push and 100 mg Thiamine IV push being administered. Decedent had a grand mal seizure (20 seconds) immediately following the administration of Narcan. An oral airway was inserted and decedent was bagged with BVM and 100% oxygen. The medical control physician was contacted and ordered airway protection with intubation. Intubation was attempted with a 7.5 endotracheal tube but proper visualization could not be obtained. The inmate was bagged with oral airway and BVM and suctioned. Good air exchange and chest rise were noted. Skin color remained good. Decedent was nondiaphoretic and his heart rate and mentation remained the same. Vitals were repeated once during transport. A physical exam of the inmate showed a morbidly obese male with scarring noted on antecubital areas. Pupils were sluggish to react. Some abrasions were noted to wrists and abdomen from chains and seizure activity. The ambulance arrived at St. Francis Hospital in Poughkeepsie at 5:14 p.m. Decedent arrived at the emergency room in respiratory distress and unresponsive. He was treated, placed on a ventilator and subsequently admitted to the Intensive Care Unit. He had a rocky hospital course lasting 13 days during which he showed *69 gradual improvement of a condition treated presumptively as nortriptyline poisoning. However, he developed complications, including pulmonary thromboembolism, which were irreversible and he died on August 13, 1997 (see exhibit 25 at 3-4; exhibit 67 at 12-14). Claimant asserts that the defendant was negligent and committed medical malpractice in its care and treatment of decedent.
With regard to claimant’s assertion that the State negligently distributed medication to decedent, the court finds that claimant has established that DOCS policies require that drugs be administered only by appropriately licensed personnel “who shall ensure that psychotropic medications such as Pamelor/ Nortriptyline are swallowed by the inmate patient” (see exhibit 11, DOCS Guidelines for Pharmacy Services and Drug Accountability). Such policies were not followed in this instance. The State Commission of Correction Medical Review Board (hereinafter COC) Summary Report (exhibit 67) found that the Green Haven medical and pharmacy staffs management of decedent’s medication was clearly deficient in not taking into consideration the total management of the medication program and that, by July 30, 1997, decedent was in possession of at least three prescriptions and thirty-five 50 mg tablets of Pamelor (exhibit 67 at 11-12). The final report of the COC (exhibit 25) concludes that Green Haven was in violation of DOCS Guidelines for Pharmacy Services and Drug Accountability § IV (A) (1) which states that all federal and state controlled medications and psychotropic medications will be administered by a nurse and section IV (A) (3) which states that a pharmacist shall have a reliable method (i.e., patient profiles, computerization, consecutive prescription numbers) by which to track refills if the prescription order is written for longer than one month.
Separate from the State’s above-asserted negligence, claimant also asserts that the State was negligent in violating DOCS and Green Haven security rules in the distribution of Pamelor to decedent. The DOCS’ Employee Manual (exhibit 8) states: “Controlled substances are not permitted to be possessed, stored, or consumed in any facility except on a valid order or prescription of a qualified physician. Under no circumstances shall inmates have access to opiates, narcotics, or other substances producing similar effects” and also provides “all employees shall take every precaution to prevent the * * * misuse of medicine.”
The DOCS Standards of Inmate Behavior (exhibit 10) regulates inmate behavior. Section 113.12 provides that *70 inmates shall not possess any controlled substance. Section 113.14 provides that inmates shall not possess quantities of medication. The evidence has established that Pamelor is a controlled substance and that on August 1, 1997 decedent was in possession of at least 30 Pamelor pills.
Based upon this record, the court finds that claimant’s submissions in support of its motion for summary judgment on the above-discussed negligence causes of action satisfy the prima facie showing required to warrant judgment as a matter of law if not rebutted by defendant.
Given claimant’s prima facie showing, it was incumbent upon the State to submit evidentiary facts or materials sufficient to demonstrate the existence of a triable issue of fact (see, Zuckerman v City of New York, 49 NY2d 557, 562; Alvarez v Prospect Hosp., 68 NY2d 320; Fileccia v Massapequa Gen. Hosp., 63 NY2d 639; Toledo v Ordway, 208 AD2d 518). The State’s opposition material relating to the discussed negligence causes of action fails to raise any such triable issue. Thus, the court finds claimant is entitled to summary judgment as to liability on these causes of action and same is hereby granted.
The court now turns to claimant’s medical malpractice causes of action. Claimant asserts that decedent did not receive proper and adequate medical care at Green Haven prior to his overdose and after he was brought to the medical clinic on August 1, 1997 following his ingesting of the pills.
It is well settled that the State owes a duty to its incarcerated citizens to provide them with adequate medical care (Kagan v State of New York, 221 AD2d 7). Moreover, when the medical care provided by the State includes the provision of psychiatric services, the State will be held to the same duty of care as a private institution engaged in such activity (Rattray v State of New York, 223 AD2d 356; Amadon v State of New York, 182 AD2d 955, 957).
Thus, when prison authorities know, or should know, that a prisoner has suicidal tendencies, a duty arises to provide reasonable care to assure that such harm does not occur (Gordon v City of New York, 70 NY2d 839).
In support of her motion, claimant has submitted the affirmation of Alan J. Tuckman, M.D., a board certified physician in psychiatry, neurology and forensic psychiatry. The doctor avers that he has reviewed decedent’s OMH and DOCS records, among other documents. In light of the facts set forth in decedent’s medical and mental health records, particularly the *71 rejection of his application for parole (which decedent had learned about by July 29), Dr. Tuckman concludes that the defendant’s medical staff, which had been treating decedent with antidepressant medications, should have anticipated the likely possibility that he would engage in self-harming, if not suicidal, behavior. He opines that defendant’s employees should have become extraresponsive to him and vigilant for such behaviors (see Tuckman affirmation in support para 4).
Claimant also asserts that the delay by the State in rendering medical assistance to her son on August 1, 1997 ultimately lead to his death. In support of this position, Dr. Tuckman avers the likelihood of his death was extremely high due to defendant’s delay in treating decedent for the overdose (Tuck-man affirmation in support para 6).
The requisite elements of proof in a medical malpractice action are (a) deviation or departure from accepted practice, and (b) evidence that such departure was a proximate cause of injury or damage (see, Bloom v City of New York, 202 AD2d 465).
The court finds that Dr. Tuckman’s affirmation is bare and conclusory and thus, claimant has failed to establish as a matter of law that she is entitled to judgment in her favor (Winegrad v New York Univ. Med. Ctr., 64 NY2d 851; Montalbano v North Shore Univ. Hosp., 154 AD2d 579). Dr. Tuckman does not provide sufficient basis for his conclusion that the State’s medical personnel should have anticipated the likely possibility decedent would engage in self-harming behavior because of his parole denial. He does not offer an opinion as to how the medical providers should have better responded to decedent’s needs.
In addition, Dr. Tuckman does not indicate what protocols should have been followed subsequent to the overdose on August 1, 1997 or how the State’s medical personnel deviated from accepted medical practice. He merely asserts that “[g]iven defendant’s delay in treating decedent for the overdose, the likelihood of his death was extremely high” (Tuckman affirmation para 6). Thus, the court finds that claimant has failed to establish her entitlement to judgment as a matter of law on the malpractice causes of action and this portion of claimant’s motion is denied.
Claimant also asserts that the State was negligent in failing to notify claimant, decedent’s next of kin, of his hospitalization. Exhibit 43, entitled “Outside Hospital Admission — Notification of Person of Inmate’s Choice,” is a DOCS form which is *72 required to be completed when an inmate is to be admitted to a hospital outside the correctional facility. Nurse Bodzak wrote on the form to be completed by decedent that he “refused to sign.” She then signed and dated the form but did not record the time (see exhibit 43). Claimant asserts that DOCS directive No. 4451 provides that a competent inmate may choose the person who is to be notified but, if the inmate is incompetent, DOCS must determine who to notify (see exhibit 42).
Claimant asserts that nurse Bodzak knew of decedent’s drug overdose and, inevitably, his consequent impairment when he refused to sign and that at the very moment Bodzak was allegedly seeking to inform decedent of his “right to have or not have one outside person of [his] choice notified [that he was about to be] admitted to an outside hospital” (see exhibit 43), decedent was undoubtedly experiencing diminished consciousness. However, the evidence submitted does not establish that decedent was experiencing diminished consciousness at the time the nurse presented the form to him. The court concludes that a factual issue exists as to whether the State was negligent in failing to notify claimant of decedent’s hospitalization in accordance with the Outside Hospital Admission — Notification of Person of Inmate’s Choice.
An emergency such as an inmate’s attempt to commit suicide by drug overdose must be reported in an unusual incident report (hereinafter UIR) within one hour of its occurrence (exhibit 23). The incident is first telephoned to the DOCS Central Albany office and then memorialized in writing. Based upon the type of incident reported, upper-level DOCS officials determine whether the pertinent procedures, such as those mandated by directive No. 4451 (“Outside Hospital Admission — Notification of Person of Inmate’s Choice”), were followed, and, if not, order appropriate action. In the case of decedent’s suicide attempt, the evidence submitted establishes that no timely UIR was filed.
Green Haven employees knew as early as August 4, 1997 that the required UIR had not been filed (see Captain Thacker’s mem to Lieutenant Pele, inquiring inter alia if a UIR “was done” and for a response “ASAP” as to whether “anything done on overdose,” exhibit 28). No UIR was filed until decedent’s death, itself a separately reportable UIR event.
Yet another institutional check that failed was the watch commander’s responsibility to follow relevant regulations. This correction official must maintain a log that records unusual incidents and any “escorted outside trip such as * * * medical *73 [ones]” (exhibit 32). Decedent’s removal by ambulance from Green Haven to St. Francis Hospital was an escorted outside trip. Moreover, this failure occurred notwithstanding Watch Commander Pelc’s knowledge that decedent had been transported to the hospital (see Pelc’s Aug. 7, 1997 mem to Captain Totten, exhibit 6).
Lieutenant Pelc’s related failure to adhere to directive No. 4451 violated his responsibility to notify decedent’s next of kin. Subdivision III-B-1 of this directive sets forth the watch commander’s responsibilities in the event an inmate is admitted to an outside hospital during “nonbusiness” hours or on a weekend (see exhibit 42). Decedent was admitted to the hospital on a weekend during a nonbusiness hour (Friday, Aug. 1, 1997, at 5:14 p.m.), which is during Green Haven’s 3:00 p.m. to midnight shift. The watch commander’s next of kin notification requirement is separate and distinct from that of the medical department.
The court finds that claimant has established that the defendant was negligent in failing to complete a UIR, in not maintaining the watch commander’s log and in not notifying claimant of decedent’s admission to an outside hospital on a weekend during a nonbusiness hour. Therefore, the court finds that claimant is entitled to summary judgment as to liability on this cause of action and this portion of the motion is granted.
Finally, the State asserts that the issue of decedent’s contributory negligence precludes the granting of summary judgment in this case. This issue is an affirmative defense and the burden of proof is upon defendant to establish a question of fact exists as to this issue. The issue of contributory negligence in a suicide case is whether based upon the entire testimony presented, the trier of facts concludes the injured person was able to control his actions (Padula v State of New York, 48 NY2d 366; Mochen v State of New York, 43 AD2d 484, 487). The standard of care which a mentally ill patient must exercise to protect himself is not based upon the objective standards of a reasonable person, but rather it is based upon the capacity of the patient and his perception of danger, considering the degree of his illness (Horton v Niagara Falls Mem. Med. Ctr., 51 AD2d 152).
General allegations, merely conclusory in nature and unsupported by competent evidence, are insufficient to defeat claimant’s entitlement to summary judgment (see, Alvarez v Prospect Hosp., 68 NY2d 320; Toledo v Ordway, 208 AD2d 518). Defendant has submitted only the affirmation of its counsel. *74 This affirmation by defense counsel is not based upon personal knowledge of the essential facts and is thus insufficient to defeat a motion for summary judgment (Caramanica v State Farm Fire & Cas. Co., 110 AD2d 869). There is no affidavit of a medical expert submitted to establish that decedent was not so mentally impaired that he was able to control his own actions (see Padula v State of New York, supra). Thus, the court concludes that the State has failed to establish a question of fact as to decedent’s contributory negligence, and therefore, this issue does not preclude the granting of summary judgment as set forth herein.
Therefore, in accordance with the foregoing, claimant’s motion for summary judgment as to liability is denied in part and granted in part. The liability portion of the trial of the remaining issues will be held as previously scheduled on February 4, 2003.