OPINION OF THE COURT
Stephen J. Mignano, J.
By decision and order filed January 29, 2003, this court granted claimant’s motion for summary judgment on various causes of action sounding in negligence (see Arias v State of New York, 195 Misc 2d 64 [2003]). Subsequently, by decision filed May 8, 2003, this court found defendant’s doctors committed medical malpractice and found defendant to be fully liable (see Arias v State of New York, Claim No. 97942, filed May 8, 2003, Mignano, J.). This decision deals only with the issue of damages.
William E. Newborn, Jr., claimant’s intestate (hereinafter decedent), was an inmate committed to the custody of the New York State Department of Correctional Services (hereinafter DOCS) and housed at Green Haven Correctional Facility. Decedent was being contemporaneously treated by DOCS physicians and New York State Office of Mental Health (hereinafter OMH) psychiatrists at Green Haven. On August 1, 1997, after ingesting an overdose of Pamelor, a prescribed medication, decedent was taken to St. Francis Hospital in Poughkeepsie, New York. Following treatment by that hospital’s emergency department, decedent was admitted to its intensive care unit (ICU) where he was treated for 13 days before succumbing to the aftereffects of his overdose on August 13, 1997.
The claim seeks damages for (1) conscious pain and suffering; (2) wrongful death, as well as funeral expenses; and (3) claimant’s personal claim for damages caused by defendant’s failure to notify her of her son’s admission to the hospital.
The damages trial was held on November 3 and 4, 2004. At that time, claimant offered her own testimony and the testimony of her medical expert, Dr. Irving Friedman. The defendant presented the testimony of its expert, Dr. Carl Koenigsmann.
Dr. Friedman testified that he has been licensed to practice medicine in New York State since 1976 and is board certified in neurology, psychiatry and neurophysiology. The witness testified to his educational background and professional experience. He *738 has been qualified as an expert witness on numerous occasions by New York state courts. Upon stipulation of the defendant, the court accepted Dr. Friedman as an expert in the fields of neurology and psychiatry.
Dr. Friedman stated that he reviewed the St. Francis medical records from August 1 to August 13, 1997 in considering decedent’s pain and suffering. Dr. Friedman provided extensive testimony and was referred to many different entries in decedent’s medical records by counsel for both sides.
Dr. Friedman testified that on August 1, 1997 decedent was brought to St. Francis in an unresponsive state having suffered a grand mal seizure while in the ambulance. His breathing was labored and there was an unsuccessful intubation attempt in the ambulance. He was then “bagged” in the ambulance (a mask was placed over his nose and mouth and air was forced into his lungs by positive pressure).
Upon arrival at the emergency room, decedent was medicated with Valium and Pavulon* to facilitate intubation. Dr. Friedman identified the endotracheal tube (exhibit 100) which is inserted into the trachea (windpipe). He testified that the insertion of this tube is an unpleasant, often painful process and, in this case, there was evidence of blood. Dr. Friedman did state that decedent was given local anesthesia before the procedure was performed.
Decedent received a nasal gastric tube (NG tube) which was inserted through the nose and into the esophagus. The NG tube (exhibit 101) is used for feeding the patient and for gastric lavage. A Foley catheter (exhibit 103) was inserted through the penis and into the bladder. A central venous line (exhibit 105) was threaded through the subclavian vein into the vena cava proximal to the heart. The central venus line was used to draw blood, give medication and measure certain pressures.
On August 2, 1997, decedent had an arterial line (catheter) (exhibit 106) placed into an artery in his wrist for management of his oxygen. The catheter checks the level of oxygen in the blood and accurately measures the blood pressure. A SwanGanz catheter (exhibit 107) was then placed through the subclavian vein and into the right atrium of the heart. The Swan-Ganz catheter measures the pulmonary artery pressure.
On August 10, 1997, a tracheotomy was performed because of decedent’s continued respiratory failure. The endotracheal tube *739 was removed and a tube was inserted through the incision in the throat. According to Dr. Friedman, this procedure frees the patient’s mouth from a tube and is a more effective means to get oxygen to the lungs.
On August 12, 1997, the Swan-Ganz catheter was removed and replaced with the central venous line. A fecal incontinence bag (exhibit 104) was also placed on decedent.
Based upon Dr. Friedman’s medical testimony, it is fair to say that there were multiple times on almost every one of the 13 days during decedent’s hospitalization that he was sedated and/or unresponsive and also periods where he was awake and attempted to communicate or was thrashing about, writhing and bucking the vent, which Dr. Friedman testified was because decedent was experiencing pain. Dr. Friedman testified that based upon his review of the medical records, it is obvious decedent knew he was doing poorly on the last two days of his life. The witness stated he does not know how decedent felt knowing he was dying.
On cross-examination, Dr. Friedman stated that decedent was given local anesthesia before each surgical procedure.
Dr. Carl Koenigsmann testified that he is a regional medical director for DOCS and has been since 2003. He stated he has been employed by DOCS since 1990 and is board certified in internal medicine. The witness testified to his educational and professional experience. He stated that he has been qualified as an expert witness in court on three occasions. Following his testimony regarding his background, the court accepted Dr. Koenigsmann as an expert in internal medicine. Dr. Koenigsmann agreed with Dr. Friedman that decedent’s hospitalization in the ICU was a series of ups and downs. He opined that decedent’s death was an unexpected catastrophic event. He opined that a tracheotomy malfunction led to decedent’s death. He disagreed with the autopsy report which stated that the probable cause of death was respiratory failure secondary to pulmonary thromboembolism and bronchopneumonia (see autopsy report, exhibit 64).
Based upon a preponderance of the credible evidence adduced at trial, the court finds that every day between August 1 and August 12, 1997 decedent endured periods of conscious pain and suffering. The court also finds that there were numerous times decedent was unresponsive, sedated, medicated and comatose. Dr. Friedman stated that decedent was choking to death over a 13-day period. He also opined that decedent knew he was doing *740 poorly but the witness could not read decedent’s mind to know if decedent thought he was dying. The proof at trial does not establish by a preponderance of the credible evidence that decedent was aware he was dying. Based upon the foregoing, the court finds that decedent had some level of cognitive awareness of pain (McDougald v Garber, 73 NY2d 246 [1989]; Cepeda v New York City Health & Hosps. Corp., 303 AD2d 173 [2003]; Ramos v Shah, 293 AD2d 459 [2002]), at least intermittently. However, neither doctor, nor this court, can determine the number of these intervals or their duration.
In determining damages for conscious pain and suffering experienced in the interval between injury and death “the degree of consciousness, severity of pain, apprehension of impending death, along with duration, are all elements to be considered” by the finder of fact (Ramos v Shah, 293 AD2d at 460). Despite the inability of this record to support any definitive determination of these elements, there is no doubt whatsoever in the court’s mind that some degree of conscious pain and suffering did exist. At the very least, the court notes that numerous invasive procedures (i.e., intubation, catheterizations and tracheotomy) were performed upon decedent and each of these were a source of discomfort/pain regardless of local anesthesia administered. Therefore, the court awards $350,000 for conscious pain and suffering from the period from August 1 to August 13, 1997, prior to decedent’s death (see Cepeda v New York City Health & Hosps. Corp., 303 AD2d 173 [2003], supra; Ramos v Shah, 293 AD2d 459 [2002], supra).
Under Estates, Powers and Trusts Law § 5-4.3 (a), damages for wrongful death are limited to “fair and just compensation for the pecuniary injuries resulting from the decedent’s death to the persons for whose benefit the action is brought” (emphasis supplied). The courts of this state have strictly adhered to the statutory restriction that recovery be limited to pecuniary or economic losses (see Liff v Schildkrout, 49 NY2d 622 [1980]; see also Parilis v Feinstein, 49 NY2d 984 [1980]). Thus, neither the grief suffered by survivors nor the loss of the decedent’s companionship is compensable (see Liff v Schildkrout, 49 NY2d 622 [1980], supra; see also Turano, Practice Commentaries, McKinney’s Cons Laws of NY, Book 17B, EPTL 5-4.3, at 439). Since its first wrongful death statute, New York has steadfastly restricted recovery to “pecuniary injuries” or injuries measurable by money, and denied recovery for grief, loss of society and affection (Gonzalez v New York City Hous. Auth., 77 NY2d 663 [1991]; Liff v Schildkrout, 49 NY2d 622 [1980], supra).
*741 In fashioning a wrongful death award in accordance with the statute, the court may consider evidence of the “reasonable expectancy” of financial support, gifts and inheritance that would have inured to those on whose behalf the claim was filed had the decedent lived (Loetsch v New York City Omnibus Corp., 291 NY 308, 310-311 [1943]). Factors traditionally considered by the courts include “the age, health and life expectancy of the decedent at the time of the injury; the decedent’s future earning capacity and potential for career advancement; and the number, age and health of the decedent’s distributees” (Johnson v Manhattan & Bronx Surface Tr. Operating Auth., 71 NY2d 198, 203-204 [1988]). The value of the decedent’s past and future lost earnings may be measured by his or her gross income at the time of death (id. at 204). Reasonable funeral expenses may also be recovered in the suit (see, EPTL 5-4.3 [a]).
In support of her claim for pecuniary loss, claimant offered solely her own testimony unsupported by any historical documentation.
As noted in my decision granting claimant’s motion for summary judgment (see Arias v State of New York, 195 Misc 2d 64 [2003], supra), decedent had a history of mental health problems and treatment dating from 1985. At the time of his death, decedent was serving concurrent sentences for automobile-related crimes in a maximum security prison and would have been eligible for parole in September 1999. He had been in custody in local and state facilities from November 1987 to 1991 and, except for a brief interval of 18 days in 1995, from 1993 until he died in 1997.
Decedent, who had been institutionalized periodically since the age of 12, had a limited work history. Mrs. Arias stated decedent earned about $25 a week performing neighborhood chores and errands. When decedent was first incarcerated, Mrs. Arias stated she had to pay someone $20 a week to perform the chores that decedent had done around her house. She further stated that during decedent’s teenage years, he worked when he was able to, typically in minimum-wage jobs. For a time, he worked in his stepfather’s moving company. Between 1991 and 1993 decedent found work at a Toys R Us store in Nassau County and also worked at various jobs in Suffolk County. According to his mother, decedent often performed work in her house, at one point resetting the tiles in her bathroom. Mrs. Arias testified that decedent’s last job, before being incarcerated for the final time in 1995, was as a shipping and receiving clerk *742 for a company in Suffolk County. She stated that he liked the job and was hoping for a raise from his $7-$7.50 hourly wage. Overall, decedent’s employment was so sporadic that he never earned enough money in any given year to require him to file a tax return. Therefore, it is virtually impossible to estimate his future earnings based upon this record. Any such attempt by this court would constitute impermissible speculation.
The court finds that claimant has failed to establish by a preponderance of the credible evidence that there was a “reasonable expectancy” of financial support, gifts or inheritance that would have inured to claimant had decedent lived (see Loetsch v New York City Omnibus Corp., 291 NY 308 [1943], supra; Erbstein v Savasatit, 274 AD2d 445 [2000]).
The court finds that claimant has established funeral costs in the amount of $2,200, which includes a $1,200 lien against any recovery in this case by the Nassau County Department of Social Services in connection with the funeral expenses.
I granted summary judgment on Mrs. Arias’s personal claim after determining that defendant “was negligent ... in not notifying claimant of [her son’s] admission to an outside hospital” in violation of DOCS Directive 4451 (Arias v State of New York, 195 Misc 2d 64, 73 [2003]).
Directive 4451 provides for notification of a person of the inmate’s choice when the inmate is admitted to a hospital outside of a correctional facility. Subdivision I provides that if the inmate is unable to speak or otherwise indicate the person to be contacted, staff shall obtain the name of the inmate’s emergency contact person, next of kin or significant other “from the Guidance Unit and/or visiting room records” (exhibit 42, Bates Stamp Page 100645). Further, pursuant to subdivision III-B-1 of the same directive, when an inmate is admitted to an outside hospital during nonbusiness hours or on a weekend (as decedent herein was), the watch commander’s designee is to obtain the name of the inmate’s emergency contact or next of kin.
In addition, Green Haven Policy and Procedure 416 (exhibit 9) deals with facility response to medical emergencies. Part B (4) provides that if an inmate is admitted to an outside hospital, the person designated as next of kin is to be contacted as is the appropriate clergy member. The inmate may choose not to have the next of kin contacted. However, when the inmate is unable to provide the information, the “Counseling Unit, Clergy personnel, etc. are to be contacted” (exhibit 9, part B [4]).
*743 On the summary judgment motion, the State did not produce any evidence of compliance with Directive 4451 or the facility policy or waiver thereof by decedent. At the damages trial, the State presented two documents (exhibits L and M) wherein decedent listed his “step-mother [sic],” Laurie Lincoln, as the person to be notified in the event of an emergency, not his mother. However, exhibit M, a downstate correctional facility screening form which decedent completed, listed Mrs. Arias as decedent’s mother. In addition, exhibit 12, decedent’s Green Haven OMH records, listed Mrs. Arias as decedent’s mother under the heading “Living Relations and Significant Others.” The form also shows her address and telephone number (see exhibit 12, Bates Stamp Page 100169). The defendant did not establish that Ms. Lincoln was notified of decedent’s hospital admission or if she had been so notified, that she would not have relayed this information to Mrs. Arias. Thus, even if this court were to find that Ms. Lincoln was an option in lieu of claimant, the fact remains that the State notified no one thereby depriving Mrs. Arias of any possibility of notification.
While there is some evidence that decedent did not wish to have anyone notified of his hospital admission, the form is unsigned by decedent (see exhibit 43). The form contains a notation that decedent refused to sign and is signed by the facility nurse. However, the defendant failed to establish that at the time the form was given to decedent, he was capable of making this choice. In addition, the DOCS directive and Green Haven policy are explicit in that if the inmate cannot provide the next of kin information, then the counseling unit and clergy are to be notified as well as the next of kin. In the absence of any evidence that the DOCS policy was followed, I find that claimant has established her cause of action and is entitled to damages.
The court’s research has not disclosed a case that involves damages from the breach of this specific duty. However, there are analogous cases. Where a mistaken notification of death has occurred or where corpses have been mishandled, “there exists ‘an especial likelihood of genuine and serious mental distress, arising from the special circumstances, which serves as a guarantee that the claim is not spurious’ ” (Johnson v State of New York, 37 NY2d 378, 382 [1975], quoting Prosser, Torts § 54, at 330 [4th ed]). Both types of cases constitute exceptions to the general rules that otherwise require — before negligently inflicted mental anguish may be compensated — that defendant’s breach of duty either has unreasonably endangered plaintiffs “physical *744 safety” or affected her because she was in the “zone of danger” (IB NY PJI3d 1476-1480 [2005]).
Johnson (supra) was a case where the claimant was advised by a state hospital that her mother had died, when in fact, her mother was alive and well. The Court of Appeals found that the daughter was “entitled to recover for the emotional harm caused by” the hospital’s tortious act (id. at 383). In contrast, in Duffy v City of New York (178 AD2d 370 [1991]) the plaintiffs son had died, but defendant’s employees negligently withheld the news of his death from her for 18 months, thus depriving plaintiff of her right to take possession of her son’s body for a proper burial. The Appellate Division, First Department, held that the delayed notification and mishandling of decedent’s corpse entitled his mother to recover damages for her mental anguish.
In Maracallo v Board of Educ. of City of N.Y. (2 Misc 3d 703 [2003]), the court determined that the mother of a 14-year-old boy who died by drowning in a wave pool while on a school field trip to an amusement park was entitled to recovery against the Board of Education for intentional infliction of emotional harm when the teachers assigned to supervise the child failed to learn the child was missing until the park closed and then left the park without having found the child and without notifying his mother that he was missing. The court found that plaintiff was entitled to recovery based upon defendant’s negligent failure to provide her timely information regarding her son independent from any cause of action related to the wrongful death.
Claimant acknowledged that her son’s automobile-related arrests and convictions created strains because she and her husband had to let him know that they couldn’t accept decedent’s recidivism. However, she said they always remained close and supported him. Claimant wrote, sent packages and visited decedent when she could. During decedent’s incarcerations, he remained in contact with the family, both by letter and telephone. During his last incarceration, even though he discouraged visits due to the costs and distance involved, his stepfather visited him at least once, as did claimant. In addition to the letters to his mother, decedent also wrote his grandmother and stepfather. The last word claimant received from her son was a letter postmarked August 1, 1997. At the same time, he also wrote to his grandmother. These letters arrived several days before claimant learned of her son’s death. Claimant testified that religion was important in decedent’s life. She said that when he was at home, he joined with family members in praise, *745 worship and daily devotionals and attended the family’s church. His last notes to his mother and grandmother were written on cards with printed religious quotes, which he had underlined. These visits, telephone calls and letters evidence a continuing relationship, rather than an estrangement, between decedent and his family.
Mrs. Arias testified that on August 13, 1997 she learned of her son’s hospitalization and death from her priest. She stated she felt overwhelming sadness, anger and guilt. She stated that if she had been told her son was in the hospital, she would have gone to visit and comfort him. She would have let him know how important he was to her and that he wasn’t alone. She stated that she lives with anger and guilt every day of her life because her son died all alone.
Claimant stated that in October 2003, some six years after her son’s death, she realized that her anger, guilt and grief, which she originally thought were normal, were not. She testified that she consulted a psychologist, Dr. Joyce Epstein, from October 2003 to March 2004. While no specific testimony was given regarding this counseling, the court finds that the totality of the circumstances, the violation of DOCS policies and the case law justify some award on this cause of action. Based upon the foregoing, the court awards claimant $25,000 for her personal claim.
To summarize, the court finds damages as follows:
[[Image here]]
Interest on the wrongful death award for funeral expenses ($2,200) shall accrue from the date of decedent’s death, August 13, 1997 (see EPTL 5-4.3). Interest on the balance of the award ($375,000) will accrue from January 27, 2003 (see Love v State of New York, 78 NY2d 540 [1991]). Claimant’s motion made at the close of her case to conform the pleading to the proof, upon which I reserved decision, is now granted. All other motions made at trial, not heretofore decided, are now deemed denied.

 Valium is a central nervous system depressant and Pavulon is a paralytic agent.